CASE NO. 25-5111

# UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

## UTE INDIAN TRIBE OF THE UINTAH AND OURAY RESERVATION,
*Plaintiff-Appellant,*

v.

## UNITED STATES DEPARTMENT OF INTERIOR, et al.,
*Defendants-Appellees.*

---

On Appeal from the United States District Court
for the District of Columbia
The Honorable Judge Carl Nichols
Case No. 18-cv-00546

---

## APPELLANT UTE INDIAN TRIBE'S ERRATA OPENING BRIEF

---

JEFFREY S. RASMUSSEN
JEREMY J. PATTERSON
Patterson Real Bird & Rasmussen LLP
1900 Plaza Drive
Louisville, CO 80027
Telephone: (303) 926-5292
Facsimile: (303) 926-5293
*Counsel for Ute Indian Tribe*

[Oral Argument Requested]

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

(A)     Parties and Amici

The parties who appeared in the District Court were:
Plaintiff
Ute Indian Tribe of the Uintah and Ouray Reservation
Defendants
United States of America
United States Department of the Interior
Ryan Zinke, Deb Haaland, as Secretaries of Interior
David Bernhardt, Tommy Beaudreau, as Deputy Secretaries of
the Interior
Intervenor Defendant
State of Utah

(B)  Rulings Under Review
D.D.C. Court Order, Dkt 116 (Feb. 13, 2025)
D.D.C. Memorandum Opinion, Dkt. 117 (Feb. 13, 2025
Department of Interior administrative decision M-37051

(C)Related cases
*Ute Indian Tribe. V. United States*, Court of Federal Claims case no. 18-
00357 (seeking monetary damages for against United States based upon
claim of compensable title, but under more expansive factual record).

# CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, and RELATED CASES ............... ii

TABLE OF AUTHORITIES ..................................................................... v

GLOSSARY .......................................................................................... xi

STATEMENT OF JURISDICTION......................................................... 1

STATUTES AND REGULATIONS ......................................................... 1

STATEMENT OF THE ISSUES.............................................................. 4

STATEMENT OF THE CASE ................................................................. 4

    A.    1863 AND 1868 TREATIES AND 1874 ACT ........................... 4

    B.    1880 ACT ................................................................................. 6

    C.    1882 Proclamation and Attempts at Allotment......................... 10

    D.    The Tribe's claim in the current case....................................... 18

SUMMARY OF ARGUMENT .............................................................. 19

ARGUMENT ...................................................................................... 21

I.    The District Court order and M-37051 must be vacated and the matter remanded for decision consistent with the Tribe's compensable title under the 1880 Act...... 21

    A.    Under the plain language of the statute, the Tribe has compensable title to 1,500,000 acres of land that the United States continues to own......................... 21

    B.    The United States erred because it wrongly asserted that the material language of the statute ends after the phrase "public lands of the United States."............................................................................................. 24

    C.    The District Court erred by violating numerous rules of statutory interpretation and by making and then agreeing with arguments that the United States had not made and that were unsupported in fact and law.......................... 29

        1.    The District Court, not the Tribe, "got the timeline wrong."..................... 29

        2.    Under every proposed interpretation of the 1880 Act, Congress required the Tribe to pay for allotments of its own land....................................... 31

        3.    The Court's cherry-picked use of "subsequent history" by Congress and the Executive Branch violates basic rules of statutory interpretation. ................... 32

        4.    If subsequent legislative history is used, the by far most persuasive document shows that in 1887 Congress understood that the Tribe had compensable title............................................................................................. 35

5.  The District Court's assertion that if Congress permitted homesteading on the Uncompahgre Reservation in 1897, that shows Congress eliminated the Tribe's compensable title is factually and legally unsupported........................37

6.  The District Court's implicit premise that "the lands not so allotted" cannot refer to lands in Utah if it also refers to lands in Colorado is incorrect............38

II.   The Court is required to interpret treaties as the members of the Tribe would have understood them. ...........................................................................................39

III.   Interpretation of treaties and laws in favor of Indian tribes. ..........................41

IV.   This Court should reject the District Court's misunderstanding of the decisions in *Ute Indian Tribe v. Utah*......................................................................41

CONCLUSION ........................................................................................................49

REQUEST FOR ORAL ARGUMENT .................................................................49

CERTIFICATE OF COMPLIANCE.....................................................................51

CERTIFICATE OF DIGITAL SUBMISSION AND PRIVACY REDACTIONS....51

# TABLE OF AUTHORITIES

*US SUPREME COURT CASES*

*Babb v. Wilkie*,
   589 U.S. 399 (2020) ........................................................21

*Bryan v. Itasca County*,
   426 U.S. 373 (1976) ........................................................41

*Carpenter v. Shaw*,
   280 U.S. 363 (1930) ................................................. 39, 41

*Choate v. Trapp*,
   224 U.S. 665 (1912) ................................................. 39, 41

*Choctaw Nation v. Oklahoma*,
   397 U.S. 620 (1970) ........................................................39

*Choctaw Nation v. United States*,
   318 U.S. 423 (1943) ........................................................39

*County of Oneida v. Oneida Indian Nation*,
   470 U.S. 226 (1985) ................................................. 39, 42

*Idaho v. United States*,
   533 U.S. 262 (2001) ........................................................42

*The Kansas Indians*,
   72 U.S. (5 Wall) 737, 760 (1866)....................................41

*Lone Wolf v. Hitchcock*,
   187 U.S. 553 (1903) ........................................................26

*Marbury v. Madison*,
   5 U.S. 137 (1803) ............................................................26

*McClanahan v. Arizona State Tax Comm'n,*
    411 U.S. 164 (1973) ................................................................ 39, 41

*McGirt v. Oklahoma,*
    207 L. Ed. 2d 985; 140 S. Ct. 2452 (2020) .....................................42

*Minnesota v. Mille Lacs Band of Chippewa Indians,*
    526 U.S. 172, 196-203 (1999) .................................................... 39, 40

*Nebraska v. Parker,*
    136 U.S. 1072 (2016) ....................................................................42

*Northern Cheyenne Tribe v. Hollowbreast,*
    425 U.S. 649 (1976) ......................................................................41

*Rosebud Sioux Tribe v. Kneip,*
    430 U.S. 584 (1977) ......................................................................41

*Ross v. Blake,*
    578 U.S. 638 (2016) ......................................................................21

*Royal Indem. Co. v. United States,*
    313 U.S. 289 (1941) ......................................................................42

*Solem v. Bartlett,*
    465 U.S. 463 (1984) .................................................................. 10, 42

*Star Athletica, L.L.C. v. Varsity Brands, Inc.,*
    580 U.S. 405 (2017) ......................................................................21

*United States v. California,*
    332 U.S. 19 (1947) ........................................................................42

*United States v. Celestine,*
    215 U.S. 278 (1909) ......................................................................42

*Washington v. Confederated Bands and Tribes of the Yakima Indian Nation,*
    439 U.S. 463 (1979) ......................................................................41

*Winters v. United States,*
207 U.S. 564 (1908) ..................................................................................39

*Worcester v. Georgia,*
31 U.S. (6 Pet. ........................................................................................41

**FEDERAL CASES**

*Harris v. District of Columbia,*
561 F. Supp. 2d 63 (D.D.C. 2008) ...............................................21

*Jones v. United States,*
846 F.3d 1343 (Fed. Cir. 2017) ................................................6, 7

*Sioux Nation of Indians v. United States,*
601 F.2d 1157 (Ct. Cl. 1979) ......................................................26

*Ute Indian Tribe v. State of Utah,*
114 F.3d 1513 (10th Cir. 1997)............................ 10, 43, 44, 45, 46

*Ute Indian Tribe v. State of Utah,*
716 F.2d 1298 (10th Cir. 1986)............................................ 43, 46

*Ute Indian Tribe v. State of Utah,*
773 F.2d 1087 (10th Cir. 1986)....................... 10, 40, 43, 44, 45, 46

*Ute Indian Tribe v. State of Utah,*
790 F.3d 1000 (10th Cir. 2015)............................................ 43, 45

*Ute Indian Tribe v. State of Utah,*
835 F.3d 1255 (10th Cir. 2016)............................................ 43, 44

*Ute Indian Tribe v. Utah,*
521 F. Supp.1072 (D. Utah 1981) ........................................ 14, 43

*Warren v. United States,*
234 F.3d 1331 (D.C. Cir. 2000) .....................................................42

## STATUTES

15 Stat. 619 ..................................................................................4

18 U.S.C.
    § 1151 .................................................................................22

25 U.S.C.
    § 463 ...................................................................................23

28 Stat. 337 ...............................................................................15

28 U.S.C.
    § 1291 ...................................................................................1
    § 1331 ...................................................................................1
    § 1362 ...................................................................................1

Act of August 14, 1894, ch. 290, 28 Stat. 286, 337 ................................15

Act of Mar. 3, 1887, ch. 368, 24 Stat. 548.................................... 142, 14, 15, 35, 36

Act of June 7, 1897, ch. 3, 30 Stat. 62, 87 ....................................... 14, 15

Act of June 15, 1880, 21 Stat. 199.................................................. *passim*

Act of May 24, 1888, 25 Stat. 157........................................................13

Brunot Treaty of 1873, 18 Stat. 36 ..............................................6

Dawes Act of 1887, 24 Stat. 388 ................................................36

Indian Leasing Act of 1891, ch. 383, 26 Stat. 794 ....................................14

Treaty of 1863, 13 Stat. 673.................................................... 4, 5, 6, 9

Treaty of 1868 ................................................................ 4, 5, 6, 9

Utah
    Utah Code § 73-21-1 .........................................................34

## FEDERAL RULES

Fed. R. App. P.
  Rule 32 ........................................................................................51

## OTHER AUTHORITIES

10 Cong. Rec. 176 (Dec. 18, 1879)...........................................................9

19 Cong. Rec. 1927-1929, 3776, 3821 (1888)........................................13

Charles F. Wilkinson, American Indians, *Time and the Law* 16 (1987) ................36

*Cohen's Handbook of Federal Indian Law,* ........................................... 9, 10, 33, 37

Department of the Interior Principal Deputy Solicitor Opinion M-37051 (Feb 21, 2018)............................................................................................ *passim*

Exec. Order of Jan. 5, 1882, I Kapp. 901. .................................................... *passim*

H.Rep.No.791, 50th Cong., 1st Sess. (1888) ...........................................13

H.Rep.No.1076, 52d Cong., 1st Sess. (1892) ..........................................14

H.Rep.No.3305, 51st Cong., 2d Sess., (1890) .........................................14

Joseph Genetin-Pilawa, *Crooked Path to Allotment* (2012)....................................33

Joseph William Singer, *Lone Wolf, or How to Take Property by Calling It A "Mere Change in the Form of Invest*ment", 38 Tulsa L. Rev. 37, 37–38 (2002) ...............................................................................................26

Judith V. Royster, *The Legacy of Allotment*, 27 Ariz. St. L.J. 1, 9 (1995)..............36

Peter Decker, "*The Utes Must Go!": American Expansion and the Removal of a People*, Ch. 6 (2004). ......................................................... 10, 11, 36

S. 1762, 51st Cong., 1st Sess., reprinted in S.Ex.Doc.No.157, 51st Cong., 1st Sess. (1890) ...................................................................................13.

S.Rep.No.240, 52d Cong., 1st Sess. (1892)...............................................14

S.Rep.No.1198, 50th Cong., 1st Sess. (1888).........................................13

U.S. Congress, Report of the Comm'r of Indian Affairs, 17th Cong., 2d sess. at 209 (Sept 1, 1880) .............................................................................11

# GLOSSARY

| | |
|---|---|
| 1863 Treaty | Treaty with the Utah Tabeguache (Tabequache) Band, Oct. 7, 1863, 13 Stat. 673, II Kapp. 856 |
| 1868 Treaty | Treaty with the Ute, Mar. 2, 1868, 15 Stat. 619, II Kapp. 99 |
| 1880 Act | Act of June 15, 1880, ch. 223, 21 Stat. 199. |
| 1882 Executive Order | Exec. Order of Jan. 5, 1882, I Kapp. 901. |
| 1887 Act | Act of March 4, 1887, 24 Stat. 548. |
| 1894 Act | Act of Aug. 14, 1894, 28 Stat. 286, 337-338 |
| 1897 Act | Act of June 7, 1897, 30 Stat. 62, 87 |
| 1945 Restoration Order | Secretary of the Interior Restoration Order, 10 Fed. Reg. 12,409 |
| 1948 Act | Act of March 11, 1948, 62 Stat. 72. |
| Brunot Treaty | Treaty of 1874, 18 Stat. 36, I Kapp. 151 |
| IRA: | Indian Reorganization Act of 1934, 25 U.S.C. §§ 461-79. |
| Kapp. | U.S. Sen. Comm'n on Indian Affairs, Indian Law and Treaties (1902-1971) (Charles J. Kappler, compiler) |
| M-37051 | Department of the Interior Principal Deputy Solicitor Opinion M-37051 (Feb 21, 2018) |
| *Ute I* | *Ute Indian Tribe. v. Utah*, 521 F. Supp. 1027 (D. Utah 1981) |
| *Ute III* | *Ute Indian Tribe v. Utah*, 773 F.2d 1087, 1097 (10th Cir. 1985) (en banc) |
| *Ute V* | *Ute Indian Tribe v. Utah*, 114 F.3d 1513 (10th Cir. 1997) |
| *Ute VI* | *Ute Indian Tribe v. Utah*, 790 F.3d 1000 (10th Cir. 2015) (Gorsuch, j.) |

## STATEMENT OF JURISDICTION

The Tribe brought its claims under 28 U.S.C. § 1362 (federal question in a civil action brought by an Indian Tribe) and 28 U.S.C. § 1331 (federal question).

This Court has jurisdiction under 28 U.S.C. § 1291 (final decisions of district courts).

The District Court issued its final decisions on February 13, 2025. App. 21, 22 (Dkt. 116, 117). The United States is a party to the case, and the Tribe filed its notice of appeal on April 8, 2025, within 60 days of the final district court decisions.

The appeal is from a final order or judgment that disposes of all parties' claims.

## STATUTES AND REGULATIONS

A. Act of June 15, 1880, ch. 223, 21 Stat. 199 ("1880 Act").

The * * * chiefs and headmen of the confederated bands of Utes * * * agree and promise to use their best endeavors with their people to procure their consent *to cede to the United States all the territory of the present Ute Reservation in Colorado, except* as hereinafter provided for their settlement.

The Southern Utes agree to remove to and settle upon the unoccupied agricultural lands on the La Plata River, in Colorado: and if there should not be a sufficiency of such lands on the La Plata River and in its vicinity in Colorado, then upon such other un-occupied agricultural lands as may be found on the La Plata River or in its vicinity in New Mexico.

*The Uncompahgre Utes agree to remove to and settle upon agricultural lands on Grand River, near the mouth of the Gunnison River, in Colorado, if a sufficient quantity of agricultural land shall be found there, if not then upon such other unoccupied agricultural lands as may be found in that vicinity in the Territory of Utah.*

The White River Utes agree to remove to and settle upon agricultural lands on the Uintah Reservation in Utah.

\* \* \* \* \* \*

The said chiefs and headmen of the confederated bands of Utes promise to obtain the consent of their people to the cession of the territory of their reservation as above on the following express conditions:

First. That the Government of the United States *cause the lands so set apart to be properly surveyed and to be divided among the said Indians in severalty* \* \* \*.

\* \* \* \* \* \*

Second. That so soon as the consent of the several tribes of the Ute Nation shall have been obtained to the provisions of this agreement, the President of the United States shall cause to be distributed among them in cash the sum of sixty thousand dollars of annuities \* \* \*, and so much more as Congress may appropriate for that purpose; and that *a commission shall be sent to superintend the removal and settlement of the Utes*, and to see that they are well provided with agricultural and pastoral lands sufficient for their future support, and upon such settlement being duly effected, that they are furnished with [other necessities], and that the money to be appropriated by Congress for that purpose shall be apportioned among the different bands of Utes in the following manner: One-third to those who settle on the La Plata River and vicinity [the Southern Utes]; *one-half to those settling on Grand River and vicinity* [*Uncompahgre Utes*], and one-sixth to those settling on the Uintah Reservation [the White River Utes].

Third. That in consideration of the cession of territory to be made by the said confederated bands of the Ute Nation, the United States, in addition to the annuities and sums for provisions and clothing stipulated and [otherwise provided by law or treaty], agrees to set apart and hold, as a perpetual trust for the said Ute Indians, a sum of money, or its equivalent in bonds of the United States, which shall be sufficient to produce the sum of fifty thousand dollars per annum, which sum of fifty thousand dollars shall be distributed per capita to them annually forever.

Fourth. That as soon as the President of the United States may deem it necessary or expedient, the agencies for the *Uncompahgres* and Southern Utes be removed to and established at suitable points, to be hereafter selected, *upon the lands to be set apart,* and to aid in the support of the said Utes until such time as they shall be able to support themselves, and that in the meantime the United States Government will establish and maintain schools in the settlements of the Utes, and make all necessary provision for the education of their children.

Fifth. [Prior treaties are reaffirmed.]

\* \* \* \* \* \*

Sec. 2. [Five Commissioners were authorized to present the agreement to the Utes for their ratification, and upon ratification to assess improvements and take a *census* of the Southern Utes, Uncompahgre Utes, and White River Utes]. \* \* \* [A]nd they [commissioners] shall also select lands and allot them in severalty to said Indians, as herein provided, and superintend the removal, location, and settlement of the Indians thereon, and do and perform such other services as the Secretary of the Interior may consider necessary for them to do in the execution of the provisions of this act.

\* \* \* \* \* \*

Sec. 3. *That the Secretary of the Interior be* \* \* \* *authorized to cause to be surveyed, under the direction of said commissioners, a sufficient quantity of land in the vicinities named in said agreement, to secure the settlement in severalty of said Indians as therein provided.* And upon the completion of said survey and enumeration herein required, the said commissioners shall cause allotments of lands to be made to each and all of the said Indians, in quantity and character as set forth in the agreement \* \* \* and whenever the report and proceedings of said commissioners \* \* \* are approved by the President \* \* \*, he shall cause patents to issue to each and every allottee for the lands so allotted, with the same conditions, restrictions and limitations mentioned therein as are provided in said agreement; and all the lands not so allotted, the title to which is, by the said agreement of the confederated bands of the Ute Indians, *and this acceptance by the United States, released and conveyed to the United States, shall be held and deemed to be public lands of the United States and subject to disposal under the laws providing for the disposal of the public lands*, at the same price and on the same terms as other lands of like character, except as provided in this act: *Provided, That none of said lands, whether mineral or otherwise, shall be liable to entry and settlement under the provisions of the homestead law; but shall be subject to cash entry only in accordance with existing law; and when sold the proceeds of said sale shall be first sacredly applied to reimbursing the United States for all sums paid out or set apart under this act by the government for the benefit of said Indians, and then to be applied in payment for the lands at* [$1.25] *per acre which may be ceded to them by the United States outside of their reservation, in pursuance of this agreement. And the remainder, if any, shall be deposited in the Treasury as now provided by law for the benefit of the said Indians, in the proportion hereinbefore stated, and the interest*

*thereon shall be distributed annually to them in the same manner as the funds provided in this act: * * *.*

(Emphasis supplied throughout, except usual statutory italics.)

## STATEMENT OF THE ISSUES

Whether the Uncompahgre Band had compensable title of the lands that were set aside on the Uncompahgre Reservation in Utah under the 1880 Act.

## STATEMENT OF THE CASE

### A.      1863 AND 1868 TREATIES AND 1874 ACT

The bands of the Ute Indian Tribe of the Uintah and Ouray Reservation have been living in the Rocky Mountains in present-day Colorado and Utah since time immemorial.  Their homeland ranged from present-day Denver to present-day Salt Lake City.  Their homeland included all of the land at issue in this case.

The Uncompahgre Band of the Ute Indian Tribe entered into Treaties with the United States in 1863 and 1868.   13 Stat. 673 (Oct. 7, 1863) ("1863 Treaty); 15 Stat. 619 (March 2, 1868) ("1868 Treaty).   In the Treaties, the Ute Indians and the United States agreed that the Uncompahgre and other bands of Ute Indians living in Colorado and Utah would give some of their land to the United States[1] in exchange for the United States' supposedly solemn reciprocal agreement that the land that the

---

[1] The lands the Tribe reserved included lands for the Uncompahgre in Colorado.    The lands that the Tribe relinquished included the lands that, in 1880/1882 became the replacement Uncompahgre Reservation.

Tribe reserved (the "Reservation")[2] would be the Tribe's permanent homeland, and that the United States would keep non-Indians out of the Reservation. Article 1 of the 1868 Treaty reaffirmed all provisions of the 1863 Treaty which were not inconsistent with the 1868 Treaty.

In Article 2 of the 1868 Treaty, the United States agreed that the Tribe would have the "absolute and undisputed use and occupation" of the Reservation created by the Treaty, that the United States would not enter the lands except as authorized by the Treaty, that the United States would not authorize others to enter the lands, and that the United States had the non-discretionary duty to preserve the Tribe's right to peaceful enjoyment of the lands.

In the 1868 Treaty, the United States further agreed that it would comply with all federal law applicable to the Reservation lands, and that it would not take the lands from the Tribe.

The United States almost immediately broke that Treaty, and the non-Indian trespassers discovered valuable gold and silver deposits on the Reservation. Only five years after the 1868 Treaty, the United States came back to the Tribe, to cajole

---

[2] The term "reservation" stems from this history, common to most of the tribes that were able to stay on parts of the land for which they held "aboriginal title." Such tribes ceded some lands, and the land that was not ceded was their "Reservation" of land. Under federal Indian law, "Reservation" has a broader meaning now.

the Tribe to give up the lands containing the most valuable of those gold and silver deposits.   The result was the Brunot Treaty of 1873.[3] 18 Stat. 36, I Kapp. 151.

## B.   1880 ACT

Seven years after the Brunot Treaty, the United States came back to the bands in Colorado, and forced those bands to enter into a new "Agreement," in which the Tribe was required to give up millions more acres of land in exchange for yet another promise that the United States would, inter alia, establish and protect a smaller Reservation for the Uncompahgre Band in Colorado if practicable, or in Utah. Congress memorialized the terms of that treaty into the Act of June 15, 1880, 21 Stat. 199 ("1880 Act").

The treaty rights under the 1863 and 1868 treaties were transferred to the replacement Reservation created by the 1880 Act and the 1882 Presidential Proclamation executing the Congressional directive to create the replacement Reservation.   1868 Treaty; §1 (providing that rights in the 1863 Treaty carried over to the 1868 Treaty); 1880 Act, fifth condition (p. 201) (providing that rights in the 1868 Treaty carried over to the lands "set apart" by the 1880 Act); *Jones v. United States*, 846 F.3d 1343 (Fed. Cir. 2017) (holding that the "bad man clause" in the

---

[3] The United States formally stopped entering into treaties with tribes in 1871.   Prior to that, treaties were between the United States and one or more tribes and bands, with advice and consent of the United States Senate.   After 1871, the United States continued to negotiate treaties or agreements for land cessions with tribes, but those treaties or agreements required approval by both the Senate and the House of Representatives.

1868 Treaty (which is a treaty right in favor of the Tribe and individual tribal members) applies to the Uncompahgre Reservation set apart by President Arthur in the 1882 proclamation).

Because of the critical importance of these provisions, pertinent parts of the statute are set out in full above.

As a part of the forced 1880 Agreement and Act of June 15, 1880, the United States agreed to "set apart" a new Reservation for the Uncompahgre Band at the confluence of the Grand River (renamed as the Colorado River circa 1921) and Gunnison River in Colorado, if there was sufficient agricultural land in that area. If sufficient land could not be located in Colorado, the United States would set apart the new Uncompahgre Reservation on agricultural lands in the territory of Utah.

In the 1880 Act, Congress repeatedly stated that the Executive Branch was required to "set apart," a new Reservation for the Uncompahgre Band. It further specified that "the government of the United States cause the lands so *set apart* to be divided among the said Indians in severalty." 21 Stat. 200-201. It stated that the agencies for the Uncompahgre and Southern Utes were "to be removed to and established at suitable points, to be hereafter selected, *upon the lands to be set apart.*" *Id*. at 201 (emphasis added).

And then in the pivotal provision, it provided that any sales of interests in any land that had been set apart for the Uncompahgre Band had to be deposited in trust

for the Band. As will be discussed below, this is the very definition of "compensable title" as that term is used in federal Indian law.[4] The 1880 Act plainly provided that land that was "set apart" but not allotted would be opened for disposal "at the same price and on the same terms as other lands of like character." 1880 Act, ch. 223, § 3, 21 Stat. 199, 203 (June 15, 1880). That Act further provided that, after setoffs, the remaining proceeds from the land sales "<u>shall</u> be deposited in the Treasury as now provided by law for the benefit of the said Indians." *Id*. at 204 (emphasis added).

President Arthur complied in relevant part with his duty under the 1880 Act. He "set apart" the new Reservation for the Uncompahgre Band. Upon doing so, the statutory provision that Uncompahgre Band had compensable title to that land applied. The land is still set apart and the Uncompahgre Band continues to have compensable title.

As discussed in more detail in the discussion of law below, the debates leading to the Act of June 15, 1880, demonstrate that Congress understood: 1) because of the Tribe's treaty rights, Congress could not or would not take any of the Tribe's

---

[4] There are different estates in land which Tribes can hold. Nearly all of the estates are different from English common law, but like English common law the estates in Indian law each come with sometimes complex and arcane sets of rights and powers. A few of the types of estates a tribe may have are aboriginal title, compensable title, ownership in trust, restricted ownership, and (in relatively limited circumstances) fee simples. In the current case, we are concerned with whether the Tribe has "compensable title." Fortunately for the Court, the parties agree on the legal test for determining if the Tribe has "compensable title," and also agree on the rights material to this case which would flow if the Tribe has compensable title.

Treaty lands unless 75% of the Tribe agreed to it; and 2) Congress was directing the Executive Branch to remove the Uncompahgre Band from its existing treaty Reservation and was directing the Executive Branch to create the new Reservation for the Uncompahgre Band. 10 Cong. Rec. 176 (Dec. 18, 1879) (Congress debates whether to require consent of the Bands to take 1868 treaty lands).

Consistent with the overarching theme of federal Indian policy at that time, Congress expected that *eventually* Congress would also get the Tribe to agree to give up most of the land on the new Uncompahgre Reservation. *Cohen's Handbook of Federal Indian Law, Section* 1.04. ("The theme of Indian Policy" beginning in 1871 and "for the remainder of the nineteen and first quarter of the twentieth century was "civilization and assimilation.") *See also* 10 Cong. Rec. at 179.

Many in Congress in 1880 believed that "manifest destiny" would ultimately result in the end of tribes and end of tribal communal ownership of lands. House Cong. Rec. at 178 (asserting that regardless of the 1863/68 Treaty provisions "this government, in my judgment, has no power to arrest the progress of that great tide," of non-Indians who were flooding into Ute treaty lands in Colorado in violation of the 1863/1868 Treaties).

The belief of some that Manifest Destiny would eventually result in the demise of the tribes is legally immaterial. If Congress' expectation for the future were material, no reservations would exist because history is clear that beginning at

some point in the 1800s and continuing through about 1928 and then again between about 1943-1961, Congress thought it would ultimately terminate all tribes and eliminate federal trust ownership of land for tribes and Indians. *Cohens Handbook of Federal Indian Law* §§1.04-1.06. The Supreme Court has "never been willing to extrapolate from this expectation [that reservations would cease to exist] specific congressional purposes of diminishing reservations with the passage of every surplus land act." *Solem v. Bartlet*, 465 U.S. 463, 469 (1984). Specific to the Ute Indian Tribe, the statutes opening the Uncompahgre Reservation neither diminished nor disestablished the Tribe's Uncompahgre Reservation. *Ute III; Ute V.*

### C.     1882 PROCLAMATION AND ATTEMPTS AT ALLOTMENT

The Executive Branch, placating Colorado politicians and citizens, but in violation of the Act of Congress, falsely claimed that suitable land could not be found near the confluence of the Gunnison and Colorado (nee Grand) Rivers in Colorado.[5]

---

[5] Grand Junction, Colorado, the largest city on the west side of Colorado, now sits at the mouth of the Gunnison, and there is fertile irrigated agricultural lands in that area. The Uncompahgre Reservation in Utah is literally uninhabited to this day: the only statistical population area in the Uncompahgre dropped from 1 person in the United States 2010 census to 0 in the most recent census.

Kharma, displaying its sense of irony, now comes back on the United States. Had the United States "set aside" the Replacement Reservation on arable land at the confluence of the rivers as it should have, much of that land would, one way or another, have been acquired by non-Indians. But because land that the United States actually set aside was without value to non-Indians (save for minerals, as it later turned out) non-Indians did not buy it and the Tribe's compensable title was not extinguished.

The Executive Branch "set apart" the congressionally mandated replacement Reservation in what the United States then believed to be some of the least valuable land anywhere in the United States— rocky high-plains desert lands--the present-day Uncompahgre Reservation.

As accurately stated by the Executive Branch in its September 1882 Report of the Commissioner of Indian Affairs to Congress, the land to which the United States forcibly removed the Uncompahgre Band was "extremely rugged and fearfully riven, being pinnacled with mountains, crags and cliffs and torn with canons, arroyos, and ravines" and that it was "valuable for nothing unless it shall be found to contain mineral deposits." (His caveat proved to be prescient: the land was found to contain one of the best oilfields in the United States, which the United States seeks to steal from the Tribe through its pretenses in the current case). The report further noted that agriculture would require irrigation, yet irrigation "appeared to be all but impossible." U.S. Congress, Report of the Comm'r of Indian Affairs, 17th Cong., 2d sess. at 209 (Sept 1, 1880). *See generally*, Peter Decker, *"The Utes Must Go!": American Expansion and the Removal of a People*, Ch. 6 (2004). Professor Decker took the first part of the book title from the rallying cry of Colorado politicians, newspapers, and the white population in general, where "go" meant "go from Colorado." Professor Decker discusses that Coloradans successfully used the

11

Meeker Incident in 1879 to accomplish their long-standing goal to force most of the bands of Utes out of Colorado.

On January 5, 1882, pursuant to the 1880 Act, and as recommended by the Commissioner of Indian Affairs, President Chester Arthur signed an Executive Order that "*set apart as a reservation for the Uncompahgre Utes*" approximately 1,900,000 acres in northeastern Utah. Exec. Order of Jan. 5, 1882, I Kapp. 901.

In 1887, Congress granted the Utah Midland Railway a right-of-way to enter the Uncompahgre Reservation. Notably, Congress directed the Secretary of the Interior to fix the amount of compensation due the Tribe for the use of the Uncompahgre lands. 24 Stat. 548 (Mar. 4, 1887).[6]

---

6 For the reasons discussed in the body of this brief, one could debate how persuasive the 1887 Act, or other later Acts of Congress would be for interpretation of the 1880 Act. And for the reasons discussed in the body of this brief, the Tribe does not believe subsequent history has any persuasive value in the current contexts. Subsequent history would only be considered, in cases not involving tribes, if an act were ambiguous. But **if** the 1880 statute is ambiguous, this Court must resolve the ambiguity by construing the statute in favor of the Tribe, as the Tribe would have understood the statute in 1880. One would not consult subsequent history, regardless of whether the statute is ambiguous or unambiguous. The District Court consideration of subsequent history was therefore error.

But, if one assumed subsequent legislation is persuasive for interpretation of the 1880 Act, the 1887 Act, being the closest in time, would be the most persuasive.

In M-37051, the Department of the Interior relied heavily on "subsequent history." Yet it illogically asserted that the 1887 Act was of no importance in that "subsequent history because the railroad was not completed and that the record did not show whether or not the railroad ever paid the Uncompahgre Band as would have been required for the railroad to obtain land rights on the Uncompahgre Reservation in Utah. App. 43 (M-37051 at 3). The importance of the 1887 Act is that it shows that in 1887 Congress understood that the

A few years after creating the Uncompahgre Reservation, the United States found that one part of the neighboring Uintah Valley Reservation contained a valuable hard mineral— gilsonite. *See* H.Rep.No.791, 50th Cong., 1st Sess. (1888); S.Rep.No.1198, 50th Cong., 1st Sess. (1888); 19 Cong. Rec. 1927-1929, 3776, 3821 (1888). Congress took the gilsonite lands, while also requiring payment of the Tribe for that land. Act of May 24, 1888, 25 Stat. 157, I Kapp. 271 (2d ed. 1904).

Gilsonite was also found on the Uncompahgre Reservation in Utah, and bills were introduced to remove that land from the Uncompahgre Reservation. Almost immediately, Congress sought to have a 12-mile strip of gilsonite lands on the Uncompahgre Reservation restored to the public domain. S. 1762, 51st Cong., 1st Sess., reprinted in S.Ex.Doc.No.157, 51st Cong., 1st Sess. (1890). On June 17, 1890, President Harrison, vetoed the bill because he found it detrimental from a policy standpoint. Veto Message of the President, June 17, 1890. Congress made multiple additional attempts to remove the gilsonite lands on the Uncompahgre, but all of those ultimately failed. H.Rep.No.3305, 51st Cong., 2d Sess., (1890);

---

Uncompahgre Band had compensable title to the land that had been set apart by the President in 1882. Whether or not the railroad was built is immaterial.

The District Court took a different, but equally illogical approach. It wrongly dismisses the 1887 Act by chastising the Tribe for "not making more of" the 1887 Act. The District Court's criticism of the Tribe's attorney was wrong. The Tribe explained why the rules of construction do not allow the parties to "make more of" later acts of Congress, and even less so of subsequent statements by Executive Branch officers. But the Tribe also discussed that if one were to rely on "subsequent history," the most important subsequent history the 1887 Act.

S.Rep.No.240, 52d Cong., 1st Sess. (1892); H.Rep.No.1076, 52d Cong., 1st Sess. (1892). None of those bills was adopted into law.

During that time period, there were multiple statements from the Executive Branch which showed that the Tribe held compensable title. For example, the Commissioner of Indian Affairs found that, under the Indian Leasing Act of 1891, ch. 383, 26 Stat. 794, I Kapp. 56, 57, the Uncompahgre Band held compensable title to their lands and could lease their lands for mining purposes. *Ute Indian Tribe v. Utah* ("*Ute I*"), 521 F. Supp., 1072, 1101 (D. Utah 1981) (citing Letter from Comm'r of Indian Affairs to Sec'y of the Interior of Dec. 30, 1892). Given that Congress and the Executive Branch both repeatedly stated that the Tribe had compensable title and that the Tribe could lease or otherwise collect for use of the Uncompahgre lands, the Tribe also reasonably understood that they had these rights.

Similarly, Commissioner of Indian Affairs Morgan:

> understood that the Uncompahgres "owned", or held compensable title to, their lands, at least for the purposes of the Indian Leasing Act, Act of Feb. 28, 1891, ch. 383, 26 Stat. 794, I Kapp. 56, 57 (2d ed. 1904), LD 23, and could lease their lands for mining purposes, though mining operations might be undesirable for other reasons. Letter from Comm. of Ind. Aff. to Secretary of the Interior of Dec. 30, 1892, JX 36. Congress had already provided for compensating the Uintahs and the Uncompahgres for lands granted as a right-of-way to the Utah Midland Railway Co. Act of Mar. 3, 1887, ch. 368, 24 Stat. 548, I Kapp. 255-256 (2d ed. 1904).

*Ute I* at n.89.

Congress attempted to have the Uncompahgre Reservation allotted under the Act of August 14, 1894, ch. 290, 28 Stat. 286, 337-338 ("1894 Act") (thereby acknowledging that the land was not then part of the public domain).   The 1894 Act provided that, following approval of allotments by the Secretary, the remaining lands would have been opened for entry.   Act of August 15, 1894, ch. 290, §21, 28 Stat. 337.

The Executive Branch appointed a three-person commission to attempt to carry out allotment under the 1894 Act.   The condition precedent to opening the lands for entry never occurred, because the Ute Indians refused to approve or accept allotments.   The Commission was disbanded before any lands were allotted or any proclamation was issued.   *Ute I*, 521 F. Supp. 1072, 1103 (D. Utah 1981) (summarizing relevant history).

Congress passed another allotment act, the Act of June 7, 1897, ch. 3, 30 Stat. 62, 87 ("1897 Act").   In contrast to the 1894 Act, the 1897 Act provided a deadline, April 1, 1898, upon which the Reservation would be "open for location and entry under all the land laws of the United States." Act of June 7, 1897, ch. 3, 30 Stat. 62, 87.

The 1897 Act permitted the United States to sell land to non- Indians, but which did not alter the Tribe's compensable title to the land until the land was sold. As the Tenth Circuit decided in *Ute III*, that type of statute, which does not restore

the lands and which does not require payment of a sum certain for restoration of the lands to the public domain does not extinguish the Tribe's trust ownership compensable title to the land, and therefore does not alter the reservation boundaries. For land on the Uncompahgre Reservation in Utah that United States sells as the Tribe's broker for sale as permitted by the 1880 Act, the Tribe was to receive compensation, and ergo the Tribe's compensable title would be sold and extinguished, but the lands that were sold would remain Reservation. For the land that was not disposed of under the 1897 Act, the United States continues to own the land subject to the Tribe's "compensable title" interest in lands. It is those lands, still owned in trust based upon the Acts of Congress, which are at issue in this case.

In the appealed administrative decision, the Executive Branch ignores the clear statutory requirement of the 1880 Act that proceeds from the sale of lands that had been "set apart" by the President as required by the 1880 Act had to be held in trust for the Uncompahgre Band, and ignores that the 1894 and 1897 Acts did not change tribal ownership rights for lands that the United States still possesses. But contrary to those laws, the Executive Branch turns around and asserts that the lands cannot be restored to the Tribe because the Tribe did not have a right to proceeds from sale. Mr. Jorjani, and then the United State, for most of the time this matter was being litigated in the District Court, simply ignored the clearly stated and express proviso that the lands were similar to public lands EXCEPT that proceeds

16

from sale of any of those lands or interests in those lands had to be provided to the Tribe.

Attempting to twist that law and the Tenth Circuit decisions on their head, M-37051 opines that because the United States did not restore the lands to the public domain for payment of a sum certain, the Tribe had no property rights to the land. Consistent with federal law governing diminishment and disestablishment of tribal Reservations, the Tenth Circuit correctly reached the exact opposite conclusion.

Later, the United States found out that the Uncompahgre Reservation contained substantial amounts of another valuable mineral--oil. At that point in history, Congress did not have the audacity to take more of the Tribe's permanent homeland.

Defendants United States, acting through then Secretary of the Interior Haaland and Assistant Secretary Beaudreau had no such qualms. In violation of acts of Congress which created the Uncompahgre Reservation and the acts of Congress and Supreme Court decisions which prevent the Executive Branch from taking tribal lands without Congressional authorization, Defendants Haaland, Boudreau, and the Department of the Interior sought to justify the Executive Branch's brazen theft of land from the Ute Indian Tribe. They should be deeply ashamed, both for the past wrongful federal actions and more so for their own non-sense attempts to rationalize the prior wrongful Executive Branch actions.

### D.     THE TRIBE'S CLAIM IN THE CURRENT CASE.

The Tribe's Uncompahgre Reservation comprise over 1,900,000 acres.  Of those acres, approximately 1,500,000 acres are still owned by the United States. Those are the only lands at issue in this case, and the sole issue is whether the Tribe holds compensable title to those 1,500,000 acres.  In its prior Indian Claims Commission suit, filed in 1951, the Tribe made a claim for about 412,500 acres that the United States had taken prior to 1951.  App. 157.  The Band distinguished between the 400,000 acres (which the Tribe, in 1951, claimed the United States had taken and sold to others).  *Id.* at ¶10.  The Band also distinguished 12,500 acres that had been allotted to Uncompahgre Indians and which the Band had been required to pay for under the 1880 Act.  *Id.* at ¶9.  Those 412,500 acres are not at issue in this case.  As the Tribe noted in its complaint in this case and above in this brief, the Tribe understands that Congress passed laws which took some of the Tribe's land and which authorized the Executive Branch to sell land as the Tribe's broker for sale. Those lands are not at issue in this case.  It is the other lands, the lands that were not sold or given away by acts of Congress, that are at issue.

The Tribe's 1951 complaint shows that the Tribe understood that by 1951, the United States had not taken most of the Uncompahgre Reservation, but that the United States had taken about 412,500 acres of the Uncompahgre Reservation. App. 157-58.

The Tribe ultimately settled its 1951 claim for the federal taking of the portion of the Uncompahgre that the United States had acted as the Tribe's broker for sale prior to 1951. But by the same token, the United States did not provide compensation for the larger part of the Uncompahgre that the United States had not taken and could not take without congressional approval. The United States now claims that because it did not find a buyer, it simply gets to keep the land. The Tribe disagrees.

## SUMMARY OF ARGUMENT

Statutory interpretation begins with the text of the statute. Here, the 1880 Act clearly states:

- the United States Executive Branch is required, at a date after the Act's passage, to survey and then "set apart" a new Reservation for the Uncompahgre Band.

- Once that new Reservation is "set apart," the United States would make allotments to the Uncompahgre Indians on the lands which had been "set apart."

- Lands that were set apart but were not allotted would be similar to public domain lands *EXCEPT* that proceeds from any real property interests in the land had to be placed into trust for the Uncompahgre Band.

The parties agreed that the Department of the Interior has the power to restore land owned by the United States on a Tribe's Reservation if the Tribe has "compensable title," i.e. **if** the proceeds from the sale of the land that had been "set apart" must be placed into trust for the Uncompahgre Band. The parties further agreed that M-37051 was dependent upon the writer's conclusion that the Tribe lacked compensable title, and that if this Court concludes as a matter of law that the Tribe has compensable title, M-37051 must be vacated and the matter must be sent back to the agency for a decision consistent with the Tribe's ongoing compensable title to the lands.

This issue of statutory interpretation is as easy as they come. The 1880 Act required the President to "set apart" lands for a new Uncompahgre Reservation.

The President "set apart the lands. Allotments were made. And the land was opened to non-Indian purchase. The 1880 Act expressly states that the proceeds from the sale of the lands that were to be set apart by the President <u>shall</u> be deposited in trust for the Tribe. That is the definition of "compensable title." About 1,500,000 acres of the lands were never bought by anyone. These lands—still owned by the United States—are the sole lands at issue in this case. The Tribe has compensable title to those 1,500,000 acres, and the District Court decision and M-37051 are wrong as matters of law.

# ARGUMENT

## I. THE DISTRICT COURT ORDER AND M-37051 MUST BE VACATED AND THE MATTER REMANDED FOR DECISION CONSISTENT WITH THE TRIBE'S COMPENSABLE TITLE UNDER THE 1880 ACT.

### A. UNDER THE PLAIN LANGUAGE OF THE STATUTE, THE TRIBE HAS COMPENSABLE TITLE TO 1,500,000 ACRES OF LAND THAT THE UNITED STATES CONTINUES TO OWN.

This Court reviews a lower court or an agency interpretation of a statute de novo. *Harris v. District of Columbia*, 561 F. Supp. 2d 63, 67 (D.D.C. 2008).

"Statutory interpretation, as we always say, begins with the text." *Ross* v. *Blake*, 578 U.S. 638, 632 (2016). "The controlling principle in this case is the basic and unexceptional rule that courts must give effect to the clear meaning of statutes as written." *Star Athletica, L.L.C.* v. *Varsity Brands, Inc.*, 580 U.S. 405, 414 (2017). "Where, as here, the words of [a] statute are unambiguous, the judicial inquiry is complete." *Babb v. Wilkie*, 589 U.S. 399, 413 (2020).

Here, the language of the statute is easy to interpret:

In its brief to the District Court, the *United States* succinctly defined the issues presented:

> The pertinent question for restoration under Section 3 of the IRA is whether Congress ever entitled the Tribe to proceeds from the sale of the [lands at issue]. That is, whether the Tribe has compensable title in the lands at issue.
>
> The "lands at issue" are about 1,500,000 acres of land that the United States

owns within the Ute Indian Tribe's Reservation (which is the Tribe's "Indian

Country." 18 U.S.C. § 1151. The 1880 Act clearly and expressly states that the Tribe is entitled to the proceeds from the lands at issue.

> The Uncompahgre Utes agree to remove to and settle upon agricultural lands on Grand River, near the mouth of the Gunnison River, in Colorado, if a sufficient quantity of agricultural land shall be found there, if not then upon such other unoccupied agricultural lands as may be found in that vicinity in the Territory of Utah.

> The said chiefs and headmen of the confederated bands of Utes promise to obtain the consent of their people to the cession of the territory of their reservation as above on the following express conditions:

> That the Government of the United States *cause the lands so set apart to be properly surveyed and to be divided among the said Indians in severalty * * *.*

> That the agenc[y] for the *Uncompahgres* be removed to and established at suitable point[s], to be hereafter selected, *upon the lands to be set apart,*

> *That the* *** President shall cause patents to issue to each and every allottee ***and all the lands not so allotted***shall be held and deemed to be public lands of the United States *** **except** That *** when sold [and after deductions of specified offsets] the proceeds of said sale shall *** be deposited in the Treasury as now provided by law for the benefit of the said Indians, in the proportion hereinbefore stated, and the interest thereon shall be distributed annually to them in the same manner as the funds provided in this act: * * *.*

The plain language of this statute is as clear as it can be. The President "set apart" the land for the Uncompahgre Band; allotments were eventually made; and the land was opened for sale to non-Indians. The 1880 Act gave the Executive Branch the power to sell the lands as the Tribe's broker for sale. As the Tribe's

broker for sales, the United States was statutorily required to place the proceeds from the sales of the land that had been "set apart' in trust for the Uncompahgre Band.

In the Court below, the United States agreed that M-37051 was dependent on the writer's conclusion that the Tribe lacked compensable title. The United States' concession was based upon 25 U.S.C. § 463(a), which is a section of the Indian Reorganization Act. That section provides the Secretary the authority to restore "remaining surplus lands of any Indian reservation" to tribal ownership if he finds it to be in the public interest.[7] 25 U.S.C. § 463(a). As the United States concedes, if a tribe has "compensable title" in lands that are owned by the United States, the lands are "remaining surplus lands." The Tribe assumes that the United States will similarly concede this same legal point in this appeal.

Based upon the plan language of 1880 Act, the Tribe had compensable title; and based upon the plain and conceded meaning of the IRA, the United States is

---

[7] Because the Tribe has compensable title to the 1,500,000 acres of land at issue, restoring them to tribal trust ownership will be in the public interest. As the United States has expressly conceded, the 1,500,000 acres of land at issue are all on the undiminished Uncompahgre Reservation. The lands are barren, are all owned by the United States, and only of value to the United States because the lands produce substantial quantities of oil, and the United States is required to pay over all profits from the lands to the Tribe. That that duty would apply even if the United States refused to restore the lands. The United States cannot buy the land or sell or give the land to anyone without a new and specific authorization from Congress, and even with congressional approval the United States would have to ensure that the Tribe receives "just compensation."

required to determine whether restoration of the lands to which the Tribe has compensable title is "in the public interests."

**B.** **THE UNITED STATES ERRED BECAUSE IT WRONGLY ASSERTED THAT THE MATERIAL LANGUAGE OF THE STATUTE ENDS AFTER THE PHRASE "PUBLIC LANDS OF THE UNITED STATES."**

In both M-37051 and the United States' primary arguments in the Court below, the United States incorrectly asserted, directly contrary to the express language of Section 3 of the 1880 Act, that the lands that were "set apart" were "public lands."

While this Court is not required to determine how the United States' attorneys made such an obvious error, the Tribe will briefly discuss that topic.

M-37051 does not provide any cogent legal basis for its conclusion that the Tribe lacked compensable title. Its conclusion was not based upon the language of the 1880 Act. In fact, in both M-37051 and in the United States' opening brief on summary judgment below, the United States simply seems to have not read the dispositive proviso. It quotes and argues as if Section 3 of the 1880 act ends after the words "public lands." *D.D.C. Dkt, 103-1, passim; e.g. id.* at 17. *See also E.g.,* D.D.C. Dkt. 35 at 25 (asserting that the 1880 Act states that the lands are "public lands" while ignoring the proviso that expressly states otherwise); *Ute Indian Tribe v. United States,* CFC case 18-cv-00357, Dkt. 75 at 24 (same).

Instead of providing a discussion based upon the statute, the Executive Branch cherry-picked statements made decades later, while simultaneously discounting the approximately equal number of statements and decisions that were based upon the Tribe's continued compensable title to the 1,500,000 acres. In substantial part, M-37051 was dependent upon the Executive Branch's prior, and failed, attempt to have the federal courts hold that the Uncompahgre Reservation had been "disestablished." The United States, which is supposed to be the Tribe's trustee, had even gone so far as to argue in courts against the Ute Indian Tribe in the *Ute Indian Tribe v. Utah* litigation. *E.g., Utah v. Ute Indian Tribe*, Sup. Ct. case 85-1821. The United States Court of Appeals for the Tenth Circuit rejected the United States and Utah's united arguments. The Tenth Circuit held that the Reservation continues to exist undiminished, and that all of the land within the boundaries of the 1882 proclamation remain Reservation lands to this day.

In M-37051, the United States admitted that it now accepts the Tenth Circuit's decisions that the Uncompahgre Reservation had been neither diminished nor disestablished. App. 40 (M-37051 at 1). Although that concession gutted the rational for the United States' assertion that the land on the Uncompahgre Reservation was "public domain," Mr. Jorjani repeated the same conclusion, albeit without legal rationale and without discussing the dispositive proviso that the Tribe retains compensable title to lands that were set apart for the replacement reservation.

At the start of the current litigation, the Defendnats did not offer any substantive argument in support of M-37051's conclusion that the Tribe lacked compensable title. Instead, the United States sought to avoid the merits legal issue by, inter alia, shockingly[8] and wrongly claiming the Executive Department had "plenary power" over tribal land. *E.g.*, D.D.C, Dkt. 95 (U.S. Resp. Brief at 9-10). *But see Lone Wolf v. Hitchcock,* 187 U.S. 553 (1903) (Only Congress, not the Executive Branch, has "plenary power" over tribal lands). The United States also argued that federal courts lack the power to interpret acts of Congress. *But see Marbury v. Madison*, 5 U.S. 137 (1803). At long last, in their motion for summary judgment the United States set forth a substantive argument based upon the 1880

---

[8] In a trio of cases culminating in *Lone Wolf v. Hitchcock*, 187 U.S. 553 (1903), the Supreme Court held that <u>Congress</u> had plenary power over tribal lands. "*Lone Wolf* is among the worst decisions ever made by the Supreme Court and is arguably the most unjust decision of all time in the field of federal Indian law." Joseph William Singer, *Lone Wolf, or How to Take Property by Calling It A "Mere Change in the Form of Investment"*, 38 Tulsa L. Rev. 37, 37–38 (2002). "The day *Lone Wolf* was handed down, January 5, 1903, might be called one of the blackest days in the history of the American Indian, the Indians' *Dred Scott* decision. To the practical statesman, it appeared to say the Indian tribes had acquired no rights by treaty which the Congress was bound to respect." *Sioux Nation of Indians v. United States*, 601 F.2d 1157, 1173 (Ct. Cl. 1979), *aff'd,* 448 U.S. 371, (1980).

But then-Secretary Haaland, through her attorneys in this case, argued that the federal courts should hold that the Executive Branch has the same plenary power as Congress, to take tribal lands without tribal consent!

Act.[9]  The United States correctly conceded that if the Tribe has compensable title, then M-37051 would have to be vacated.

The United States and the Tribe agreed that the following language from section 3 of the 1880 Act referred to the land on the on the Uncompahgre Reservation that was later "set apart" by the 1882 Presidential proclamation:

> all the lands not so allotted, the title to which is, by the said agreement of the confederated bands of the Ute Indians, and this acceptance by the United States, released and conveyed to the United States, shall be held and deemed to be public lands of the United States and subject to disposal under the laws providing for the disposal of the public lands …

The United States argued as if the statute ended there.  It completely ignored the proviso which contradicted its argument—that the lands are not public lands, and instead are similar to public lands except that the Tribe had compensable title.[10] Based upon its claim that the proviso did not exist, the United States then discussed at length cases which state that if Congress deems lands to be "public lands," a tribe does not have compensable title.  It concluded that because the above provision

---

[9] The Tribe does not view any of the United States arguments to be based upon the rationale of M-37051.  Once the United States sets forth what argument it is now going to jump to for the current appeal, the Tribe will discuss whether that argument is permitted based upon M-37051.

[10] Reading between the lines in the United States briefs in which the United States agreed with the Tribe that Section 3 of the 1880 Act referred to the lands on the Uncompahgre Reservation that was created in Utah and the United States emphatic and repetitive assertions that section 3 did not give the Tribe a right to proceeds from the sales, it appears that the United States simply did not read to the proviso which clearly states that the Band had the rights to proceeds.

stated the lands were public lands, the Tribe lacked compensable title and M-37051 had therefore correctly rejected restoration of the lands.

Once the United States tried to provide a rationale for M-37051, the Tribe defeated those arguments. The Tribe showed that the Executive Branch does not have "plenary power" over tribal lands.

The Tribe also discussed that, contrary to the United States argument, section 3 of the 1880 Act does not end after the words "public lands."

If Section 3 had ended where the United States consistently pretended that it ended, the United States' argument would have been plausible. But section 3 does not end there. Instead, and as clearly as it possibly can, Congress stated that lands that (as both the Tribe and United States agreed) would be set aside in 1882 were similar to public lands, EXCEPT THAT, the Tribe had compensable title to those lands:

> *Provided, That none of said lands, whether mineral or otherwise, shall be liable to entry and settlement under the provisions of the homestead law; but shall be subject to cash entry only in accordance with existing law; and when sold the proceeds of said sale shall be first sacredly applied to reimbursing the United States for all sums paid out or set apart under this act by the government for the benefit of said Indians, and then to be applied in payment for the lands at [$1.25] per acre which may be ceded to them by the United States outside of their reservation, in pursuance of this agreement. And the remainder, if any, shall be deposited in the Treasury as now provided by law for the benefit of the said Indians, in the proportion hereinbefore stated, and the interest thereon shall be distributed annually to them in the same manner as the funds provided in this act: * * *.*

This is the exact definition of "compensable title."

After the Tribe defeated the United States' attempt to interpret the 1880 Act as if the express proviso was not in the statute, the United States desperately latched onto footnote 84 of M-37051, which states without explanation that "the payment provisions in section 3 of the 1880 agreement are more properly understood as concerning the future disposition of Colorado lands that had been ceded under the provisions of that agreement." App. 56 (M-37051 at 16).

### C. THE DISTRICT COURT ERRED BY VIOLATING NUMEROUS RULES OF STATUTORY INTERPRETATION AND BY MAKING AND THEN AGREEING WITH ARGUMENTS THAT THE UNITED STATES HAD NOT MADE AND THAT WERE UNSUPPORTED IN FACT AND LAW.

As the District Court stated at oral argument on the motions for summary judgment, the United States' last-ditch argument was contrary to rules of statutory interpretation. App.375-76 (T. 18-19). The Tribe was therefore stunned when the District Court came back a month later with a decision which violates multiple basic rules of statutory interpretation, resulting in the District Court now asserting that the United States' unnatural reading of the statute was the proper interpretation of the statute, and that the District Court's own reading of the statute at oral argument was unambiguously wrong.

### 1. The District Court, not the Tribe, "got the timeline wrong."

In its decision, the District Court asserted that the reference to "the land not so allotted" could <u>not</u> refer to the land on the replacement Reservation in Utah

because that Reservation had not been created and allotments had not been made on that Reservation. It then deduced that the reference to "the land not so allotted" must refer solely to land in Colorado.

The District Court's analysis –its logic--is plainly wrong. The 1880 Statute should not, and indeed cannot, be interpreted to mean that the "lands not so allotted" must be specifically identifiable in 1880. However one interprets Section 3 of the 1880 Act, the determination of "the lands not so allotted" was to occur in the future, and the lands "not so allotted" could not be identified in 1880.

In section 3 of the 1880 Act, Congress sets for the following:

- At some time **after** the Act is passed, the United States is required to survey and locate a replacement Reservation for the Uncompahgre Band and Southern Utes;

- **After that**, the President is to "set apart" the replacement reservations;

- **After** the new Reservation is created members of the Uncompahgre Band will be allowed allotment on the new Reservation; and

- **After** allotment is completed, the "land not so allotted" on that new Reservation will be open to non-Indian settlement.

*See also* App. 18 (District Court notes that "much of" Section 3 is written in the future tense, and that the United States assertion that "the land not so allotted" as if they were identifiable in 8809 "doesn't seem to make sense." App. 375 (T. at 18).

Judges sometimes come into oral arguments thinking they have a stumper question—a question that the losing side will not be able to answer. Often the Judge is correct, but on occasion the argument turns because the attorney has the answer. In the oral argument in this case, the Court did not have any difficult questions for the Tribe (because the Court Correctly believed at oral argument that the Tribe's interpretation of section 3 of the 1880 Act was correct and the United States interpretation was unnatural and incorrect. *Id.*).

But after oral argument, in its opinion, the District Court poses a question that it apparently thinks the Tribe could not answer: "How would one define [the lands not so allotted] in 1880," when the replacement Reservation had not even been created in 1880. App. 32.

That is not even a difficult question. Regardless of whether the new Reservation was "set apart" in Colorado, Utah, or New Mexico or in any other state in 1882, one could not have been able to determine the "lands not so allotted" in 1880. The Judge, not the Tribe, got the timeline wrong.

### 2. Under every proposed interpretation of the 1880 Act, Congress required the Tribe to pay for allotments of its own land.

The District Court next asserts that that the Tribe's interpretation of the 1880 statute must be wrong because "the requirement that the Utes pay for the allotments in Utah supports the government's view." App. 33. This is a weak argument to

begin with, since it is unrelated to the core question of whether "the lands not so allotted" were on the to-be-designated future Reservation (which as discussed above, they obviously were).

Additionally, as with the District Court's error above, the District Court's interpretation has the same "flaw" as the Tribe's argument. The statute clearly stated that the Band or its members were required to pay the Tribe for the allotted land— whether that land would have been near Grand Junction or whether, as it turned out, the land was in Utah. The Tribe agrees with the Judge that this was bad from a policy perspective, but that same flaw applies no matter how one interprets "the land not so allotted."

### 3. The Court's cherry-picked use of "subsequent history" by Congress and the Executive Branch violates basic rules of statutory interpretation.

We are all well familiar with the political twists and turns over the past generation. Given that knowledge, a court would not assume that statements by the current administration would be probative of the meaning of statutes passed by Congress during the Obama Administration in 2011. Similarly, statements by current members of Congress giving their interpretation of statutes passed in 2011 would not be entitled to weight. Instead, courts looks to the language used by the Congress that passed the statute.

But here, the District Court assumed that the Congress in 1894 or 1897 was the same as the Congress in 1880. It was not, and perhaps nowhere were these differences as clear as in the field of Indian law. Between President Grant and President McKinley, the party in the White House changed with each election and the House and Senate each switched multiple times. Federal policy toward Indians was a large issue and that policy was in flux. 1880 was the end of the peace policy era and was the start of federal policy discussions that eventually led to the General Allotment Act of 1887. *E.g.*, *Cohens' Handbook of Federal Indian Law*, §§1.04-1.06.; C. Joseph Genetin-Pilawa, *Crooked Path to Allotment* (2012) (providing a detailed analysis of the origins of allotment, the political debates related to the same, and the changing view of Congress between the Civil War and 1889).

The contrast between the legislative history and language of the 1880 Act on the one hand and the legislative history of the 1894 statute illustrates the above. The District Court relied upon statements by a Congressman in 1894 to determine the meaning of the 1880 Act. Dkt.117 at 13 (citing D.D.C. Dkt. 112-2 at 107). The Congressman's purpose for that 1894 report[11] was to attempt to justify forcibly taking most of the Uncompahgre Tribe's Reservation land in Utah, and the report contained various other false statements consistent with that slant. For example, to

---

[11] The Congressman's report in 1894 was after the fundamental shift in federal Indian policy in 1887, as discussed below.

justify the report's false central assertion that the Tribe had more land than it needed, the report claimed that "60% of the land within each of these two reservations is suitable for agriculture and capable of irrigation." D.D.C. Dkt 112-2 at 107. The actual figure is debatable, but well under 10%. *E.g.,* U.S. Department of the Interior, *Annual Report of the Commissioner of Indian Affairs to the Secretary of the Interior for the Year 1886*, 225 ("The Uncompahgre Reserve is a desert. Of the 1,933,440 acres embraced therein not one can be relied on to produce a crop without irrigation, and not more than 3 per cent of the whole is susceptible of being made productive by process of irrigation."); Ute [Unapproved] Water Compact, Utah Code 73-21-1 ("The total acreage under irrigation or susceptible to sustained production of agricultural crops by means of irrigation [on the Reservation] is … 120,157 acres," again about 3% of the land). This Court should not rely upon Congressman Lynch's slanted report years later, and this Court must rely upon the 1880 Act.

The 1894 report also states, "The Indians, in their present condition, make no use whatever of a very large proportion of these lands, which are rich in resources and capable of sustaining a large population if reclaimed and utilized." *Id.* at 3. As noted above, the Uncompahgre Reservation remains virtually uninhabited to this day. When choosing between the language of a statute and later statements of a legislator or politician who has a different aim, the language of the statute controls.

### 4. If subsequent legislative history is used, the by far most persuasive document shows that in 1887 Congress understood that the Tribe had compensable title.

If this Court were to rely upon legislative history after 1880, the most persuasive document is the 1887 Act which required the Utah Midland Railway to pay the Uncompahgre Band for land that the railroad wanted to possess on the Uncompahgre Reservation. The 1887 Act was the first relevant act of Congress after the 1880 Act. In the 1887 Act, Congress demonstrated that it understood that the Tribe had compensable title to the lands on the Uncompahgre Reservation in Utah. It authorized a railroad to enter the Reservation AND it required the railroad to pay the Tribe for the land that the railroad needed to occupy.

In its decision, the District Court dismissed the importance of the 1887 Act in a footnote in which it stated that the parties did not make much of the act and so it would not either. Of course, the United States did not make much of the 1887 Act, because the Act shows that in the first Congressional Act regarding the Uncompahgre Reservation after 1880, Congress acknowledged the Tribe's compensable title. The United States' failure to make much of the act is consistent with its attempt to cherry-pick from an inconsistent historical record.

The Tribe discussed the 1887 Act but focused on the correct rule of statutory interpretation—that an act of a later Congress is not considered unless the statute is ambiguous, and even then, subsequent legislative history is a relatively weak source

for interpreting an act of a prior Congress.  But if one is going to rely upon subsequent history, the 1887 Act is the strongest source we have, and it is directly contrary to the United States argument on the merits of this case.

The District Court's analysis of historical evidence leading up the 1880 Act is similarly unsupported by the record in this Court.  For example, the District Court incorrectly asserts that in 1880, "allotment was the then-common practice of dividing reservation land among individual Indians with a view toward their eventual assimilation." D.D.C. Dkt. 117 at 3.  That is flatly wrong.

Congress passed the General Allotment Act, commonly referred to as the Dawes Act, in 1887.  24 Stat 388.  Prior to the Dawes Act, federal policy had primarily been to establish boundaries between, and separate, Indians from non-Indians.  Charles F. Wilkinson, American Indians, *Time and the Law* 16 (1987).  The Dawes Act was a "fundamental shift from separatism within reservations to assimilation."  Judith V. Royster, *The Legacy of Allotment*, 27 Ariz. St. L.J. 1, 9 (1995).  Ute members in 1880 understood the existing policy of creating a tribal reservation from which non-Indians were generally barred,[12] and their understanding

---

[12] For example, after the Meeker incident, the Ute Indian Tribe asserted that federal troops could not cross into the Tribe's Reservation without permission from the Tribe.  Federal troops initially attempted to comply with that tribal decision, but eventually violated it, leading to fighting on the northern edge of the Tribe's Colorado Reservation.  Peter R. Decker, *The Utes Must Go* 133 (discussing that the large contingent of federal troops initially planned to stop at the Reservation border, with only one leader and five soldiers crossing the border.)

must guide this Court's interpretation of the 1880 Act. The debates regarding allotment were from about 1880 to 1887, and even Dawes initially wanted allotment to be an option that a tribe could, but need not, choose. *Cohen's Handbook of Indian Law* § 1.04 at p. 77 (2005 Ed.).

> **5.** **The District Court's assertion that if Congress permitted homesteading on the Uncompahgre Reservation in 1897, that shows Congress eliminated the Tribe's compensable title is factually and legally unsupported.**

The District Court further asserted that the 1897 Act permitted non-Indians to own parts of the Uncompahgre Reservation without paying for the land, and that this eliminated the Tribe's compensable title to all land on the Uncompahgre Reservation. That argument is wrong because, as discussed above, Congress can only terminate a tribe's compensable title through clear and unequivocal acts. Silence does not terminate the Tribe's rights.

Here, the 1880 Act gave the Tribe compensable title to the lands that were "set apart." The dispositive proviso in the 1880 Act states that the land is only subject to cash entry and that the proceeds from sale must be provided to the Tribe.

Even if someone did homestead land on the Uncompahgre Reservation after 1897 (something for which there are no facts in support)[13] that does not change the

---

[13] The Tribe notes that its 1951 ICC complaint brought a takings claims for the approximately 400,000 acres that the United States had disposed of to non-Indians on the Uncompahgre Reservation, and the Tribe and United States settled that claim.

1880 statutory provision that proceeds from the sales must be deposited in the Tribe's account. The District Court did not and could not point to any language in the 1894 or 1897 Act that purports to amend the 1880 provision that proceeds from sale must be deposited to the Tribe's account. Particularly apparent under the high standard that Congress can only take tribal title by clear and unequivocal legislation, the 1897 Act did not take the Tribe's compensable title.

6. **The District Court's implicit premise that "the lands not so allotted" cannot refer to lands in Utah if it also refers to lands in Colorado is incorrect.**

As discussed in detail above, the 1880 Act expressly shows that the President was to "set apart" a new Reservation for the southern Utes and a new Reservation for the Uncompahgre Band. Those Reservations could have been "set apart" in lands that were part of the 1868 Reservation or were outside the 1868 Reservation. But regardless of where they were "set apart," the provision for compensable title applied to the land that was "set apart." Whether the Tribe would then also have a right to compensable title to lands that was part of the 1868 Reservation but was not part of the Reservation that was "set apart" in 1882 is an interesting question, but is not the question presented here. Instead, here, the applicable language is clear that the lands that are "set apart" as required by the 1880 Act come with compensable title. Those lands were in Utah, and the Tribe retains compensable title to those lands.

**II. THE COURT IS REQUIRED TO INTERPRET TREATIES AS THE MEMBERS OF THE TRIBE WOULD HAVE UNDERSTOOD THEM.**

To interpret a tribal treaty, the Court would first have to know how the members of the Tribe understood the tribal treaty language. The Supreme Court has made clear that Indian treaties are unique, governed by different canons of construction than those that apply to statutes and to other treaties. *E.g., County of Oneida v. Oneida Indian Nation*, 470 U.S.226, 247 (1985). Owing to the special relationship between the United States and Indian tribes, Indian treaties must be interpreted liberally in favor of Indians. *Choctaw Nation v. United States*, 318 U.S. 423, 431-432 (1943); *Choate v. Trapp*, 224 U.S. 665, 675 (1912).

Any ambiguities in the language of an Indian treaty must be resolved in favor of the Indians. *Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 196-203 (1999); *McClanahan v. Arizona State Tax Comm'n*, 411 U.S. 164, (1973); *Carpenter v. Shaw*, 280 U.S. 363, 367 (1930); *Winters v. United States*, 207 U.S. 564, 576-577 (1908).

Further, Courts must endeavor "to give effect to the terms as the Indians themselves would have understood them." *Mille Lacs Band of Chippewa Indians*, 526 U.S. at 196; *Choctaw Nation v. Oklahoma,* 397 U.S. 620, 631 (1970).

The Supreme Court has made clear that while a court should look to the parties' choice of words, it should also consider the "larger context that frames the

Treaty," including its "history, purpose and negotiations." *Mille Lacs Band of Chippewa Indians*, 526 U.S. at 196-203.

In the present case, the Executive Branch will apparently continue to claim that when the United States promised to create a permanent homeland for the Uncompahgre Ute Indians in the 1868 Treaty, and then later agreed to create the replacement Reservation, the Uncompahgre Ute Indians would have understood that the United States was not taking on a mandatory duty to maintain the replacement Reservation. Mr. Jorjani's opinion does not cite anything which would support that conclusion, nor did the Court. Instead, they rely upon logically flawed arguments and documents from decades later, which show a range of interpretations by Executive Branch officers.

The Tribe's view is that it is bluntly obvious that the tribal members understood that the United States' 1868 promise to create a permanent Reservation for the Uncompahgre Band meant exactly what it said—that the United States took on the mandatory duty to create that permanent Reservation for the Uncompahgre Band. The federal courts have already analyzed that record and have concluded that the Tribe did not understand that the 1880 Act was meant to take the Uncompahgre's more fertile and larger homeland in Colorado in exchange for a few barren allotments in Utah. *Ute III* at 1092. Instead, the Tribe understood that, as expressly stated in the 1880 Act, the United States was expelling the Tribe from its home in

Colorado, but was setting aside a new replacement Reservation in either Colorado or Utah.

## III. Interpretation of Treaties and Laws in Favor of Indian Tribes.

The congressional intent must be clear, to overcome "the general rule that '(d)oubtful expressions are to be resolved in favor of the weak and defenseless people who are the wards of the nation, dependent upon its protection and good faith.'" *McClanahan*, 411 U.S. at 174 (quoting *Carpenter*, 280 U.S. at 367); *Washington v. Confederated Bands and Tribes of the Yakima Indian Nation*, 439 U.S. 463, 484 (1979); *Rosebud Sioux Tribe v. Kneip*, 430 U.S. 584, 586 (1977); *Bryan v. Itasca County*, 426 U.S. 373, 392 (1976); *Northern Cheyenne Tribe v. Hollowbreast*, 425 U.S. 649, 655 n.7 (1976); *Choate*, 224 U.S. at 675; *The Kansas Indians*, 72 U.S. (5 Wall) 737, 760 (1866); *Worcester v. Georgia*, 31 U.S. (6 Pet.) 515, 582 (1832).

Applying this law, even if the statute were ambiguous (which it is not) this Court must vacate and reverse.

## IV. This Court should reject the District Court's misunderstanding of the decisions in *Ute Indian Tribe v. Utah*.

The U.S. Supreme Court has already, and repeatedly and recently, analyzed the dividing line between the Legislative and Executive branches when it comes to federal attempts to take land from an Indian Tribe. The settled legal rule is easily stated: once land is set apart for a tribe, only Congress, not the executive branch, can

deprive the tribe of any rights in the land. As the Supreme Court recently held: Because of the Nonintercourse Act, "only Congress can divest a reservation of its land and diminish its boundaries." *McGirt v. Oklahoma*, 591 U.S. 894, 903 (2020) (quoting *Solem v. Bartlett*, 465 U.S. 463, 470 (1984)). *See also Nebraska v. Parker*, 136 U.S. 1072 (2016); *Idaho v. United States*, 533 U.S. 262 (2001); *County of Oneida v. Oneida Indian Nation,* 470 U.S. 226 (1985); *United States v. California,* 332 U.S. 19, 40 (1947); *Royal Indem. Co. v. United States,* 313 U.S. 289,294 (1941); *United States v. Celestine,* 215 U.S. 278 (1909); *Warren v. United States* 234 F.3d 1331, 1338 (D.C. Cir. 2000). Based upon the rules of construction discussed above, any such act of Congress must be clear and unambiguous.

The courts have already applied this law to the Uncompahgre Reservation, and concluded that there is no such Act of Congress. If this Court were required to start over from scratch, reasonable legal minds might differ. In fact, the judges who have reviewed this matter over the last fifty years have reached differing results. The Tribe expects that ultimately the Court would come to the same conclusion that the Tenth Circuit, in a decision the United States now accepts, came to in 1983.

Based upon that historical record, both sides to this case could cite statements by tribal officers, federal legislators and various executive branch officers which offer some support for their positions. Certainly, the bulk of that record supports

the Tribe, either side could cherry-pick some of the statements that they believe support their position.

Fortunately for this Court and yet more fortunately for the Ute Indian Tribe, the Court is not writing on a blank slate. The hard work has already been completed in *Ute Indian Tribe v. State of Utah*, 521 F. Supp. 1072 (D. Utah 1981)(*Ute I*); *Ute Indian Tribe v. State of Utah*, 716 F.2d 1298 (10th Cir. 1986) (*Ute II*); *Ute Indian Tribe v. State of Utah*, 773 F.2d 1087 (10th Cir. 1986) (*Ute III*); *Ute Indian Tribe v. State of Utah*, 114 F.3d 1513 (10th Cir. 1997) (*Ute V*); *Ute Indian Tribe v. State of Utah*, 790 F.3d 1000 (10th Cir. 2015) (*Ute VI*); and *Ute Indian Tribe v. State of Utah*, 835 F.3d 1255 (10th Cir. 2016) (*Ute VII*) (collectively referred to herein as the "*Ute Indian Tribe* Decisions").

The *Ute Indian Tribe* Decisions stem from a suit that the Tribe filed in the United States District Court for the District of Utah in 1975. In *Ute I*, federal district court Judge Jenkins issued a decision which runs for over 80 pages in the federal supplement reporter, with over 200 footnotes. Judge Jenkins provided a very thorough discussion of the voluminous historical record, but his legal analysis was less robust. He concluded that the Uncompahgre Reservation in Utah had been disestablished by the Act of June 7, 1897.

In *Ute III*, the Tenth Circuit, sitting en banc, rejected the District Court and the prior panel decision regarding the Uncompahgre Reservation. It concluded that the

Tribe did not understand that any of the Acts of Congress resulted in the Tribe losing the new Uncompahgre Reservation. *Id.* at 1092. It held that the lands on the Uncompahgre Reservation in Utah had been removed from the public domain and that Congress never restored those lands to the public domain. Instead, the subsequent Acts of Congress only allowed the United States to sell some of those lands as the Tribe's land broker. In *Ute V*, the Tenth Circuit held that its mandate in *Ute III*, as it relates to the Uncompahgre Reservation, remains the binding mandate.[14] In *Ute I, Ute II, and Ute III*, the United States came in as amicus *against the Tribe.* Its arguments at the time were based upon a 1938 solicitor opinion which Mr. Jorjani virtually copied into M-37051. The Tenth Circuit rejected the United States arguments—it rejected the arguments that form the basis for the 1938 opinion and for M-37051. It is therefore inexplicable that in the decision currently before this Court, Mr. Jorjani dismisses the *Ute Indian Tribe* decisions with a disingenuous conclusory assertion that *Ute Indian Tribe* decisions are not on point. They are directly on point, and they establish that Congress never returned the lands to the public domain.

For example, in his opinion, Mr. Jorjani discusses that in 1934, the Tribe asked whether some lands in the Uncompahgre Reservation could be restored under

---

[14] In *Ute V*, the Court modified its mandate in part for lands on the Uintah Valley Reservation. That modification is of no import to the current case regarding the Uncompahgre Reservation.

Section 3 of the IRA, and that the Executive branch responded that the 1897 Act had disestablished the Uncompahgre Reservation. But we now know that the Uncompahgre Reservation was not disestablished. *Ute III, Ute V*. M-37051 is based upon and dependent upon the historically incorrect argument that Utah and the United States put forward in *Ute III and that the Tenth Circuit directly and explicitly rejected*. *Ute III*.

Mr. Jorjani attempted to rely upon various statements by Executive Branch officers. As noted above, the Executive Branch statements span the gamut, and Mr. Jorjani cherry-picked the ones that supported the decision that he wanted to issue, and the District Court did the same. In fact, the District Court chastised the Tribe's attorney for not providing more discussion of statements and acts of Congress that came years or decades later. But more important than the range of opinions by Executive Branch officers, those statements do not change the meaning of an Act of Congress that was adopted decades earlier. Many of those statements, including statements that Mr. Jorjani relies upon (such as his discussion of events in 1934, discussed in the preceding paragraph) illustrate the wrong done by the *Executive Branch* that is at issue in this case—their attempt to escape the plain language of the 1880 Act by relying upon the Executive Branch's own prior erroneous statements.

In *Ute VI* and *Ute VII*, then Judge Gorsuch writing for the Court, reiterated that for the Uncompahgre Reservation, the nearly 30-year-old mandate from *Ute III*

45

remains binding. Although in *Ute I, II ,and III*, the United States had come in against the Tribe, in *Ute VII*, the United States supported the finality of *Ute III* and *Ute V*. United States' Brief as Amicus Curiae in Support of Plaintiff-Appellant and in Support of Reversal at 12 n.8, *Ute Indian Tribe v. Myton*, No. 15-4080 (10th Cir. Oct. 22, 2015), Dkt. 10313147. The record in the *Ute Indian Tribe* Decisions also showed that the United States had prosecuted federal criminal cases, and that the United States had taken other actions based upon its acceptance of the decision in *Ute III*, that all land on the Uncompahgre Reservation is Indian Country. *E.g.*, *Ute Indian Tribe v Utah*, D. Utah, Dkt. 176-5 at 7 (In response to a criminal defendant's request for an evidentiary hearing on whether his crime occurred in Indian Country, the United States wrote that a hearing was "unnecessary as the boundaries of the Uncompahgre Reservation have never been in dispute and the dispute over the status of the Uncompahgre Reservation as Indian Country has been resolved.")

In M-37051, Mr. Jorjani admitted that the 1880 Agreement provides for the creation of a new Reservation for the Uncompahgre Band and that "In accord with this Agreement an executive order withheld from sale 1.9 million acres of public domain land in Utah Territory, *setting them aside as a reservation for the Uncompahgre Utes*." *Id.* at 2. Mr. Jorjani also acknowledged that the United States "supported the finality of" the holdings [*in Ute III and Ute V*] on the Reservation's boundary and "Indian country" status for jurisdictional purposes." *Id.* at 1.

But in the next sentence after he makes that dispositive acknowledgement, he made one of his key errors.   Contrary to the very same decisions that the United States supports, Mr. Jorjani makes the wholly conclusory statement that "I conclude that those decisions do not address, much less resolve, the separate inquiry of whether the Tribe has any ownership interest in these lands or whether Section 3 of the IRA is an appropriate source of authority for the 'restoration they [sic: referencing the Ute Indian Tribe, so should be in the singular] request." *Id.* at 1-2. *See also id.* at 7 (replicating the same incorrect conclusory assertion, again without any analysis of the pivotal Tenth Circuit decisions.)

Notably Mr. Jorjani does not provide any analysis of the Tenth Circuit's decisions that the United States accepts.   Nor could he have, because it is painfully obvious from the *Ute Indian Tribe* decisions that his conclusory assertion is wrong. The reason all of the land on the Uncompahgre Reservation is Indian Country (as the United States agrees and accepts) is because the Tribe still has trust ownership rights in that land/proceeds from that land.   The land was not restored to the Public Domain, precisely because the 1880 Act stated that the land was to be set apart from the public domain.

From this, and based upon the legal rule that only Congress can take tribal lands, it follows that the lands remain trust lands.   The lands had been removed from

the public domain and set aside for the Uncompahgre Band, and were never restored to the public domain by Congress!!

But in M-37051, Mr. Jorjani ties himself into knots attempting to deny the obvious legal result. He contrasts the 1894 Act with the 1897 Act. He notes that the 1894 Act would have restored the lands to the public domain if the Tribal members had approved—demonstrating that Congress understood that the lands were <u>not</u> in the public domain and would only be restored if Congress restored the lands to the public domain. He also cites a letter, which is likely wrong but ultimately for current purposes immaterial, in which the Secretary of the Interior incorrectly opined that Congress *could have* taken the lands without compensation to the Tribe. He notes in the 1897 Act, Congress did not restore the lands to the public domain.

Notably, and as has been unfortunately typical in its relationship with the Tribe and other tribes, the United States asserts that the Tribe must abide by the treaty provisions and congressional takings of tribal land which are favorable to the United States, while the United States is free to violate its reciprocal obligations. The United States holds the Tribe to the Tribe's cessation of lands in 1868 (which included the lands that became the Uncompahgre Band's Reservation in Utah). That cessation was in exchange for, *inter alia*, the guarantee of a permanent reservation for the Uncompahgre and other bands in Colorado. And the United States has no

qualms with Congress deciding to take the Tribe's Reservation in Colorado.  But the United States does not want to be held to the *quid pro quo* that Congress placed into the very same statute—that the new Reservation would be "set apart" from the public domain and the Uncompahgre Band would have compensable title to that new Reservation.  The United States asserts this Court cannot make the Executive Branch comply with that part of Congress' actions.  The Executive Branch's position is morally abhorrent, and fortunately it is also legally incorrect.

## CONCLUSION

For all of the reasons stated above, this Court should vacate the District Court opinion and remand with instructions for the District Court to remand to the agency for a decision consistent with the Tribe's compensable title in the lands at issue.

## REQUEST FOR ORAL ARGUMENT

Because of the extreme importance of this matter to the sovereign Ute Tribe and because of the complexity of the issues, the Tribe requests oral argument.

RESPECTFULLY SUBMITTED this 28th day of August 2025.

PATTERSON REAL BIRD & RASMUSSEN LLP

By:  /s/ *Jeffrey S. Rasmussen*
　　　Jeffrey S. Rasmussen
　　　Jeremy J. Patterson
　　　1900 Plaza Drive
　　　Louisville, Colorado  80027
　　　Telephone: (303) 926-5292
　　　Facsimile: (303) 926-5293

jrasmussen@nativelawgroup.com
jpatterson@nativelawgroup.com
*Counsel for Ute Indian Tribe*

# CERTIFICATE OF COMPLIANCE

1.    This document complies with the word limit of Fed. R. App. P. 32(a)(7)(b), excluding the parts of the document exempted by Fed. R. App. P. 32(f), because this document contains 12086 words.

2.    This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) as this document has been prepared in a proportionally spaced typeface using Microsoft Office 365 Word in Times New Roman font size 14.

Dated: August 28, 2025.

*/s/ Jeffrey S. Rasmussen*
Jeffrey S. Rasmussen
PATTERSON REAL BIRD &
RASMUSSEN LLP
1900 Plaza Drive
Louisville, Colorado 80027
Telephone: (303) 926-5292
Facsimile: (303) 926-5293
Email: jrasmussen@nativelawgroup.com
*Counsel for Osage Minerals Council*

# CERTIFICATE OF DIGITAL SUBMISSION AND PRIVACY REDACTIONS

I hereby certify that a copy of the foregoing **ERRATA RESPONSE BRIEF**, as submitted in Digital Form via the Court's ECF system, is an exact copy of the written document filed with the Clerk and has been scanned for viruses with SentenialOne, dated 07/16/2025, and, according to the program, is free of viruses. In addition, I certify all required privacy redactions have been made.

By:  */s/ Jeffrey S. Rasmussen*
        Jeffrey S. Rasmussen
        Counsel for *Osage Minerals Council*

## CERTIFICATE OF SERVICE

I hereby certify that on this 28th day of August 2025, I caused the foregoing

**ERRATA RESPONSE BRIEF** to be filed with the Clerk of Court for the United

States Court of Appeals for the D.C. Circuit using the CM/ECF System, with service

to all parties by that system.

August 18, 2025           By:  */s/ Jeffrey S. Rasmussen*
                                        Jeffrey S. Rasmussen
                                        Counsel for *Osage Minerals Council*