NOT YET SCHEDULED FOR ORAL ARGUMENT

No. 25-5111

_____

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

UTE INDIAN TRIBE OF THE UINTAH AND OURAY RESERVATION,
*Plaintiff/Appellant,*

v.

UNITED STATES OF AMERICA, et al.,
*Defendants/Appellees.*

_____

Appeal from the United States District Court for the District of Columbia
No. 1:18-cv-00546 (Hon. Carl J. Nichols)

_____

**BRIEF FOR APPELLEES**

_____

ADAM R.F. GUSTAFSON
*Principal Deputy Assistant Attorney General*

AMBER BLAHA
MARY GABRIELLE SPRAGUE
*Attorneys*
Environment and Natural Resources Division
U.S. Department of Justice
Post Office Box 7415
Washington, D.C. 20044
(202) 532-3302
mary.gay.sprague@usdoj.gov

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

## A.     Parties and Amici

The Federal Defendants/Appellees in this case are the United States of America; U.S. Department of the Interior; Douglas Burgum, in his official capacity as the Secretary of the U.S. Department of the Interior; and Karen Budd-Falen, in her official capacity as Acting Deputy Secretary.  The State of Utah is an Intervenor-Defendant/Appellee.  The Plaintiff/Appellant is the Ute Indian Tribe of the Uintah and Ouray Reservation.

## B.     Rulings Under Review

The ruling under review is the order and opinion in Ute Indian Tribe of the Uintah and Ouray Reservation, No. 1:18-cv-00546, Docket Nos. 116 & 117 (Feb. 13, 2025), United States District Judge Carl J. Nichols, presiding.  The opinion is reported at 775 F. Supp. 3d 75.

## C.     Related Cases

The case on review was not previously before this court or any other appellate court.  Appellees are aware of the following pending related case: Ute Indian Tribe of the Uintah and Ouray Reservation v. United States, No. 18-00357 (C.F.C.) (seeking compensation for an alleged taking of land).

/s/ *Mary Gabrielle Sprague*
MARY GABRIELLE SPRAGUE

Counsel for Federal Appellees

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ................................................................................. i

TABLE OF AUTHORITIES ................................................................. iv

GLOSSARY ................................................................................... viii

INTRODUCTION ................................................................................ 1

STATEMENT OF JURISDICTION ...................................................... 2

STATEMENT OF THE ISSUE ............................................................. 3

PERTINENT STATUTES AND REGULATIONS ............................... 3

STATEMENT OF THE CASE ............................................................. 3

    A.    The Indian Reorganization Act ............................................ 3

    B.    Historical background ........................................................... 4

        1.    Indigenous Ute bands ................................................ 4

        2.    The 1863 and 1868 Treaties with the Uncompahgre Band ..................................................... 4

        3.    The 1880 Agreement and Act and 1882 Executive Order ............................................................................ 6

        4.    The Acts of 1894 and 1897 ...................................... 10

    C.    Interior's decision ............................................................... 11

    D.    District Court proceedings .................................................. 16

SUMMARY OF ARGUMENT ............................................................ 18

STANDARD OF REVIEW ................................................................. 20

ARGUMENT ........................................................................................21

I.  The 1880 Act did not grant the Ute Tribe compensable title in
    the Uncompahgre Reservation........................................................22

    A.  The 1880 Act did not require the government to establish
        a replacement "reservation" for the Uncompahgre Band
        in Utah. ..............................................................................23

    B.  Section 3 unambiguously provided for proceeds from the
        sale of the unallotted lands on the *1868 Reservation* to be
        paid to the Confederated Bands. .........................................29

    C.  The fifth condition of the 1880 Agreement did not carry
        over the Tribe's compensable title in the 1868
        Reservation to the Uncompahgre Reservation. ...................37

    D.  The Indian canons of construction do not require
        interpreting the 1880 Agreement to grant a replacement
        reservation with compensable title......................................38

II. The 1882 Executive Order did not grant the Tribe compensable
    title in the Uncompahgre Reservation. .........................................42

III. Congressional and administrative actions between 1882 and
     1894 do not support the Tribe's claim of compensable title in
     the Uncompahgre Reservation......................................................43

IV. The 1894 Act and 1897 Act did not grant the Tribe
    compensable title to the Uncompahgre Reservation and, if the
    1880 Act is interpreted to have granted the Tribe compensable
    title, Congress took that title in the 1894 and 1897 Acts. ............47

V.  The *Ute Indian Tribe v. Utah* decisions do not hold that the
    Tribe had compensable title............................................................50

CONCLUSION ...................................................................................54

CERTIFICATE OF COMPLIANCE ...................................................55

# TABLE OF AUTHORITIES*

## Cases

*Al-Tamimi v. Adelson,*
  916 F.3d 1 (D.C. Cir. 2019) ................................................. 37

*Choctaw Nation of Indians v. United States,*
  318 U.S. 423 (1943) ........................................................... 41

*Cnty. of Yakima v. Confederated Tribes & Bands of the Yakima Indian Nation,*
  502 U.S. 251 (1992) ............................................................. 3

*Confederated Bands of Ute Indians v. United States,*
  330 U.S. 169 (1947) ...................................................... 31, 42

*DeCouteau v. District County Court,*
  420 U.S. 425 (1975) ........................................................... 41

*Defenders of Wildlife v. Zinke,*
  849 F.3d 1077 (D.C. Cir. 2017) ........................................... 20

*Delaware Dep't of Nat. Res. & Env't Control v. EPA,*
  895 F.3d 90 (D.C. Cir. 2018) ............................................... 35

*Hagen v. Utah,*
  510 U.S. 399 (1994) ........................................................... 50

*Jones v. United States,*
  846 F.3d 1343 (Fed. Cir. 2017) ........................................... 38

*Karuk Tribe of California v. Ammon,*
  209 F.3d 1366 (Fed. Cir. 2000) ........................................... 42

*Loper Bright Enterprises v. Raimondo,*
  603 U.S. 369 (2024) ........................................................... 21

---

\* Authorities upon which we chiefly rely are marked with asterisks.

*McClanahan v. Arizona State Tax Comm'n,*
411 U.S. 164 (1973) ..................................................................41

*Murphy v. Royal,*
875 F.3d 896 (10th Cir. 2017) ...............................................52

*Negonsott v. Samuels,*
507 U.S. 99 (1993) ..................................................................41

*Sierra Club v. FERC,*
153 F.4th 1295 (D.C. Cir. 2025) ............................................21

*Skidmore v. Swift & Co.,*
323 U.S. 134 (1944) ................................................................21

*South Carolina v. Catawba Indian Tribe,*
476 U.S. 498 (1986) ................................................................41

*United States v. Southern Ute Tribe or Band of Indians,*
402 U.S. 159 (1971) ................................................................31

*Ute Indian Tribe v. Utah (Ute I),*
521 F. Supp. 1072 (D. Ut. 1981) ..............4, 7, 9, 10, 11, 28, 42, 46, 47

*Ute Indian Tribe v. Utah (Ute III),*
773 F.2d 1087  (10th Cir. 1985) ..............25, 39, 42, 50, 51, 52, 53, 54

*Ute Indian Tribe v. Utah (Ute V),*
114 F.3d 1513 (10th Cir. 1997) .............................................50

## Statutes

5 U.S.C. § 706(2)(A)................................................... 2, 20, 54

*25 U.S.C. § 5103(a) .....................1, 3, 4, 11, 12, 14, 21, 45, 50, 52, 53

28 U.S.C. § 1291 .......................................................................3

28 U.S.C. § 1331 .......................................................................2

Act of May 5, 1864, 13 Stat. 63 ...............................................................7

Act of April 29, 1874, 18 Stat. 36 .........................................................37

*Act of June 15, 1880, 21 Stat. 199 (1880 Act) ...... 6-9, 14-17, 22-44, 46-49, 51, 53

Act of July 28, 1882, 22 Stat. 178 (1882 Act) ..................................34, 44

Act of March 3, 1887, 24 Stat. 548 (1887 Act) .................................44, 45

Act of May 24, 1888, 25 Stat. 157 ........................................................46

Indian Leasing Act, 26 Stat. 794 (1891) ...............................................46

Indian Appropriations Act of August 15, 1894, 28 Stat. 286, 337 (1894 Act) ......10, 15, 17, 34, 47, 48, 50

*Indian Appropriations Act of June 7, 1897, 30 Stat 62, 87 (1897 Act)..........10, 11, 13, 15-18, 21, 22, 39, 45, 47-50

Act of May 27, 1902, 32 Stat. 263 (1902 Act) ..................................12, 15

Indian Reorganization Act, 48 Stat. 984 (1934) ......................................3

## Other Authorities

Treaty with Tabeguache Utes, 13 Stat. 673 (Oct. 7, 1863) ...................... 4-6, 22, 43

Treaty with Ute Indians, 15 Stat. 619 (Mar. 2, 1868) ..................5, 6, 22, 30, 31, 38

Executive Order of October 3, 1861, I Kapp. 900 .....................................7

*Executive Order of January 5, 1882, I Kapp. 901 ....... 9, 14, 16, 17, 21, 29, 30, 42, 43, 51, 53

10 Cong. Rec. 176 (December 18, 1879) ...............................................25

H.R. Rep. No. 53-660 (1894) ......................................................... 27, 34

2 Fed. Reg. 2,563 (Dec. 2, 1937) ..............................................................14

10 Fed. Reg. 12,409 (Oct. 2, 1945) .................................................. 14, 15

Cohen's Handbook of Federal Indian Law § 1.04 (2005 ed.) .................................40

# GLOSSARY

APA            Administrative Procedure Act

IRA            Indian Reorganization Act

**INTRODUCTION**

The Ute Indian Tribe of the Uintah and Ouray Reservation ("Tribe"), a federally recognized Indian tribe, challenges the Department of the Interior's March 2, 2018 decision (2018 Decision) denying the Tribe's request to "restore" to the Tribe about 1.5 million acres of public domain land within the Uncompahgre Reservation in Utah (Public Domain Lands) under section 3 of the Indian Reorganization Act (IRA), 25 U.S.C. § 5103(a). The Public Domain Lands are largely administered by the Bureau of Land Management.

The 2018 Decision by the Deputy Secretary was principally based on a legal opinion from the Office of the Solicitor, M-37051, dated February 21, 2018 (Solicitor's Opinion or M-Opinion). The Solicitor's Opinion reviewed the relevant statutes, executive orders, judicial decisions, and Interior's prior administrative decisions. It explained that Interior has consistently interpreted the IRA to authorize the restoration of lands to a tribe only if the tribe is entitled to proceeds from any sale of the lands, and concluded that the Public Domain Lands were not eligible to be restored to the Tribe under the IRA because the federal government could use the lands for its own purposes without any right of compensation in the Tribe. The Tribe accepts Interior's interpretation of IRA § 3, but argues that an 1880 agreement with the Utes and ratifying statute provided that the Tribe was entitled to compensation upon sale of the Public Domain Lands.

In 2018, the Tribe filed a five-count complaint in district court.  In 2021 and 2022, the district court dismissed four counts because they were barred by the applicable statutes of limitations or otherwise failed to state a claim.  Those counts are not at issue in this appeal.

In 2024, the parties filed cross-motions for summary judgment on the remaining count, a challenge to the 2018 Decision under the Administrative Procedure Act (APA), 5 U.S.C. § 706(2)(A), seeking to set aside the 2018 Decision.  In a February 13, 2025 Memorandum Opinion, the district court granted Interior's cross-motion for summary judgment, concluding that "the Tribe has no compensable title to the government-managed land in the Uncompahgre Reservation."  App.22.

In this appeal, the Tribe has failed to demonstrate any error in Interior's 2018 Decision.  This Court should thus affirm the district court's judgment.

## STATEMENT OF JURISDICTION

(A)    The district court had subject matter jurisdiction under 28 U.S.C. § 1331 because the Tribe's claims arose under the APA and the IRA.

(B)    The district court granted the government's cross-motion for summary judgment on February 13, 2025.  Plaintiff filed a timely notice of appeal on April 8, 2025.

(C)     This Court has jurisdiction under 28 U.S.C. § 1291 because the appeal is from a final judgment that disposes of all parties' claims.

## STATEMENT OF THE ISSUE

Whether Interior's conclusion that the Tribe did not have compensable title to the Public Domain Lands within the Uncompahgre Reservation was contrary to law.

## PERTINENT STATUTES AND REGULATIONS

The pertinent statutes are set forth in the Addendum and Appendix.

## STATEMENT OF THE CASE

### A.     The Indian Reorganization Act

Congress enacted the IRA, 48 Stat. 984 (1934), to support "principles of tribal self-determination and self-governance," including by ending the policy of allotting tribal trust lands to individual tribal members.  *Cnty. of Yakima v. Confederated Tribes & Bands of the Yakima Indian Nation*, 502 U.S. 251, 255 (1992).  Sections 1 and 2 "halted further allotments and extended indefinitely the existing periods of trust applicable to already allotted (but not yet fee-patented) Indian lands."  *Id*.  And section 3 "provided for restoring unallotted surplus Indian lands to tribal ownership."  *Id*.  It authorized "[t]he Secretary of the Interior, if he shall find it to be in the public interest, … to restore to tribal ownership the remaining surplus lands of any Indian reservation heretofore opened, or authorized

3

to be opened, to sale, or any other form of disposal by Presidential proclamation, or by any of the public-land laws of the United States." 25 U.S.C. § 5103(a) (formerly codified as 25 U.S.C. § 463(a)).

## B. Historical background

### 1. Indigenous Ute bands

At the time of contact, Ute Indians inhabited a large territory within the current states of Colorado, Utah, and New Mexico, and subsisted by hunting and gathering. *See Ute Indian Tribe v. Utah*, 521 F. Supp. 1072, 1092 (D. Utah 1981) (*Ute I*). They were organized in several bands with homelands in different parts of the territory. Appellant—the Ute Indian Tribe of the Uintah and Ouray Reservation—is comprised of descendants of the Uintah Band, White River Band, and Tabeguache Band (later known as the Uncompahgre Band) who reside on the Uintah and Ouray Reservation in Utah. *Id*. at 1093. Descendants of other bands are now members of the Ute Mountain Ute Tribe and the Southern Ute Tribe. *Id*.

### 2. The 1863 and 1868 Treaties with the Uncompahgre Band

In 1863, the Tabeguache Band entered into a treaty with the United States, which was ratified in 1864. App.92-98 [13 Stat. 673 (Oct. 7, 1863)]. In the Preamble, the Band described the boundaries of a large homeland area in the mountains of the Territory of Colorado to which it claimed an exclusive right against all other Indian tribes. App.92. That area was bounded as follows: (1) on

the south by the southern border of the Colorado Territory; (2) on the east by the eastern edge of the Rocky Mountains; (3) on the north by the northern border of the Colorado Territory; and (4) on the west by the mountain summit west of North Park and Middle Park south to the Grand River (now called the Colorado River), down the Grand River, up the Gunnison River and Uncompahgre River, then south and southeast through the Sierra La Plata to the southern border of the Colorado Territory. *See id*. Notably, the westernmost point of the aboriginal territory claimed by the Tabeguache Band was the confluence of the Grand River and Gunnison River (located about 25 miles east of the Territory of Utah).

In Article II of the 1863 Treaty, the Band reserved as its hunting grounds within that large area a smaller area that extended west to the confluence of the Grand River and Gunnison River, and relinquished all claims to land except for the reserved hunting grounds. App.93, 96. In exchange for the cession, the United States promised annuities and other assistance. App.93-94.

In 1868, the Tabeguache Band and other bands of Ute Indians entered into a separate treaty with the United States (1868 Treaty). App.99-107 [15 Stat. 619 (Mar. 2, 1868)]. Under Article I, "[a]ll the provisions of the [1863] treaty … which are not inconsistent with the provisions of this treaty … are hereby reaffirmed and declared to be applicable and to continue in force as well to the other bands …." App.99. In Article II of the 1868 Treaty, the United States

agreed to "set apart for the absolute and undisturbed use and occupation of the Indians herein named, and for such other friendly tribes or individual Indians as from time to time they may be willing, with the consent of the United States, to admit among them," a large rectangular area of land bounded as follows: (1) on the south by the southern border of the Colorado Territory; (2) on the east by the 107° West meridian (located about 115 miles east of the western border of the Colorado Territory); (3) on the north by the fortieth parallel (located about 210 miles north of the southern border of the Colorado Territory); and (4) on the west by the western border of the Colorado Territory. *Id.* This area included part of the hunting grounds reserved by the Tabeguache Band in the 1863 Treaty and additional land along the western border of the Colorado Territory. In Article III, the bands relinquished all claims to any portion of the United States or its territories outside of that reservation. App.100. As in the 1863 Treaty, the United States promised other assistance. App.100-102.

### 3. The 1880 Agreement and Act and 1882 Executive Order

In 1880, certain Ute bands—Southern Utes, Uncompahgre Utes, and White River Utes (collectively referred to as the "Confederated Bands")—entered into an agreement with the United States (1880 Agreement) to cede their 1868 Reservation in Colorado to the United States in exchange for allotments in severalty to individual Indians. App.108-111 [21 Stat. 199-202 (Mar. 6, 1880)]. Specifically,

their chiefs and headmen agreed to "use their best endeavors with their people to procure their consent to cede to the United States all the territory of the present Ute Reservation in Colorado, except as hereinafter provided for their settlement." App.109.

In the relevant provision, the Uncompahgre Utes agreed to take their allotments "upon the unoccupied agricultural lands on Grand River, near the mouth of the Gunnison River, in Colorado"—*i.e.*, within the 1868 Reservation—"if a sufficient quantity of agricultural land shall be found there," and "if not then upon such other unoccupied agricultural lands as may be found in that vicinity and in the Territory of Utah." *Id.* The Southern Utes agreed to take allotments "upon the unoccupied agricultural lands on the La Plata River, in Colorado"—also within the 1868 Reservation—or if the land there was insufficient, "then upon such other unoccupied agricultural lands on the La Plata River or its vicinity in New Mexico." *Id.* And the White River Utes agreed to take their allotments "upon agricultural lands on the Uintah Reservation in Utah."[2] *Id.*

The allotments were to be made "in severalty" to individual Indians. *Id.* The allotments of agricultural and grazing land would be either a quarter section

---

[2] The Uintah Valley Reservation was established in Utah by the Executive Order of October 3, 1861, I Kapp. 900. *See Ute I*, 521 F. Supp. at 1094 & n.62. In the Act of May 5, 1864, 13 Stat. 63, Congress then "set apart [the Uintah Valley] for the permanent settlement and exclusive occupation of such of the different tribes of Indians of [the Territory of Utah] as may be induced to inhabit the same."

(160 acres) or an eighth section (80 acres) depending on the age and family status of the allottee.  App.109.

The 1880 Agreement was codified as Section 1 of the Act of June 15, 1880, 21 Stat. 199-205 (1880 Act).  App.108-114.  Section 2 authorized the President to appoint five commissioners who would, among other duties, "select lands and allot them in severalty to said Indians."  App.111-112.  Section 3 elaborated on the commissioners' duties "to cause to be surveyed … a sufficient quantity of land in the vicinities named in said agreement"—which were presumptively within the 1868 Reservation for the Tabeguache and Southern Ute Bands—and report to the President who would issue patents to the allottees.  App.112.

Section 3 further provided that "all the lands not so allotted, the title to which is, by the said agreement of the confederated bands of the Ute Indians, and this acceptance by the United States, released and conveyed to the United States, shall be held and deemed to be public lands of the United States and subject to disposal under the laws providing for the disposal of the public lands at the same price and on the same terms as other lands of like character."  *Id*.  The proceeds were to be used for specified purposes "for the benefit of said Indians."  App.112-113.  The 1880 Act also provided for appropriations for various other payments to the Indians and expenditures for their support.  App.113-114.

The commissioners thereafter reported that there was insufficient agricultural land along the Grand River in Colorado for the Uncompahgre Utes and recommended, in accord with the 1880 Agreement, that they be relocated in Utah. *See* App.156 [Petition, Indian Claims Commission Dkt. 349 (1951)]; *see also Ute I*, 521 F. Supp. at 1097.

On January 5, 1882, President Chester Arthur issued an Executive Order "with[holding] from sale and set[ting] apart as a reservation for the Uncompahgre Utes" a tract in the Territory of Utah.[3] App.115 [I Kapp. 901] (1882 Executive Order). The described tract was roughly rectangular in shape, extending from the eastern border of the Territory of Utah west about 54 miles, measuring about 60 miles from south to north, and adjoining the Uintah Valley Reservation at the tract's northwest corner—an area of about 1.9 million acres. App.350 (acreage). The southern boundary of the tract was a significant distance (25 or more miles) north of the Grand River. The area withdrawn by the 1882 Executive Order is referred as the "Uncompahgre Reservation" for purposes of this brief.

---

[3] Meanwhile, in 1881, an Indian agency was established at Ouray (within the future 1882 Executive Order Reservation). *Ute I*, 521 F. Supp. at 1097. In 1886, the previously separate Uintah and Ouray Agencies were consolidated for joint administration, becoming collectively known as the "Uintah and Ouray Reservation." *Id*. at 1075, 1098.

### 4.  The Acts of 1894 and 1897

In the Indian Appropriations Act of August 15, 1894, 28 Stat. 286, 337 (1894 Act), Congress directed the President to appoint a three-member commission "to allot in severalty to the Uncompahgre Indians within their reservation, in the Territory of Utah, agricultural and grazing lands according to the [1880] treaty." App.117.  The Indians were to pay $1.25/acre for the allotments "from the fund now in the United States Treasury realized from the sale of their lands in Colorado as provided by their contract with the Government." *Id*.  The statute also provided for the disposition of the unallotted lands.  In the first phase, the commissioners were to identify the areas that were "unsuited or will not be required for allotments," which would then "be restored to the public domain and made subject to entry as hereinafter provided." *Id*.  In the second phase following allotment, "the remainder of the lands on said reservation" was to "be immediately open to entry under the homestead and mineral laws of the United States." *Id*.  No allotments were made under the 1894 Act.  *See Ute I*, 521 F. Supp. at 1103.

In the Indian Appropriations Act of June 7, 1897, Congress passed another allotment statute, 30 Stat. 62, 87 (1897 Act), directing Interior "to allot agricultural lands in severalty to the Uncompahgre Ute Indians now located upon or belonging to the Uncompahgre Indian Reservation," which allotments could be located "upon the Uncompahgre and Uintah reservations or elsewhere in said State."  The 1897

Act provided that, beginning on April 1, 1898, the unallotted lands would be "open for location and entry under all the land laws of the United States" with the exception of "lands containing gilsonite, asphalt, elaterite, or other like substances" which were "reserved to the United States." *Id*.

Eighty-three allotments totaling about 12,500 acres were eventually made within the boundaries of the Uncompahgre Reservation. *See* App.157 [Indian Claims Commission Petition]; *see also Ute I*, 521 F. Supp. at 1104-05. The federal government subsequently disposed of about 400,000 acres within the Uncompahgre Reservation under the public land laws, for state school purposes, and for public reservations. App.157. The remaining area still owned by the United States—about 1,500,000 acres—is the Public Domain Lands at issue in this appeal. Br. 18.

### C.    Interior's decision

In 2016, the Tribe requested that Interior "restore" the Public Domain Lands within the Uncompahgre Reservation to tribal trust status under IRA § 3, submitting historical documentation and legal analysis. *See* App.349, 357 n.45 [M-Opinion 37051].

In a letter dated March 2, 2018, then-Deputy Secretary David Bernhardt—consistent with Interior's prior rejections of the Tribe's similar requests—determined that the Public Domain Lands were not eligible for restoration under

IRA § 3 and advised that special legislation would be necessary for those lands to be taken into trust by the United States.  App.348.  In reaching that conclusion, he relied on Solicitor's Opinion M-37051 by then-Solicitor Daniel Jorjani.  *Id*.

The Solicitor explained Interior's consistent interpretation of IRA § 3 based on its text and legislative history.  App.355-357.  As Commissioner of Indian Affairs John Collier had explained in the IRA's legislative hearings, and as legislators understood, the provision was intended to authorize restoration of lands only when the proceeds of sale of those lands would have gone to the tribe.  App.355-356; *see also* App.202-206 [Collier statement (Feb. 27, 1934)].

Interior had first applied IRA § 3 shortly after its enactment.  Commissioner Collier explained in an August 10, 1934 letter to the Secretary of the Interior that IRA § 3 applied to certain reservations—those "where lands have been opened, the Indians to receive the proceeds of sale only as the tracts are disposed of"—and recommended that the Secretary temporarily withdraw undisposed lands on 27 such reservations for consideration of restoration to the tribes.  App.352; *see also* App.219-223 [Collier letter].  The reservations included the 1868 Reservation in Colorado and the Uintah Reservation in Utah which had been opened by the Act of May 27, 1902, 32 Stat. 263 (1902 Act).  App.221-222; *see also* App.119-120 [1902 Act].  The Secretary approved those withdrawals and later withdrew the

undisposed lands of three additional reservations. App.352-353. The Uncompahgre Reservation in Utah was not among them.

The M-Opinion further explained that Interior has consistently interpreted "surplus lands" to mean "lands that are held for the benefit of Indians," that is, "the tribes were entitled to some or all of the proceeds of the subsequent sale of those lands out of federal ownership." App.356-357. It cited 12 such opinions, discussing some of them in detail. App.356 & n.43, 361-362; *see also* App.228-290 [the opinions].

As for the Uncompahgre Reservation, the Solicitor concluded that the Public Domain Lands in the Uncompahgre Reservation, which had been opened for disposal by the 1897 Act, were not eligible for restoration because "the factual and legal history ... reveal[s] no convincing evidence that the Tribe had a compensable ownership interest in the Uncompahgre Reservation that would have been the basis to hold sales proceeds for the benefit of the Tribe or any predecessor group of Indians." App.350.

That conclusion was consistent with three prior opinions addressing the status of the Uncompahgre Reservation. The Secretary first advised the Tribe in a January 12, 1935 letter that the 1897 Act returned the lands of the Uncompahgre Reservation to the public domain and that the lands "are not recognized as being of the class intended for restoration to tribal ownership under section 3." App.359

(quoting the letter); *see also* App.290-291 [the letter]. Second, in a February 3, 1939 letter, the Assistant Secretary similarly advised the Tribe's attorney that the undisposed-of lands within the Uncompahgre Reservation were not eligible for restoration under IRA § 3 because there was "a rather clear indication that no tribal rights or equities in this area were established in the Uncompahgres by the Executive Order of January 5, 1882." *Id.* (quoting the letter); *see also* App.346-347 [the letter]. And third, in a December 10, 1946 memorandum about grazing privileges on the Uncompahgre Reservation, the Solicitor once again concluded that lands could only be restored to the Tribe by Congressional action. App.354 & n.27.

In contrast, the Solicitor explained that Interior had granted two requests for restoration of other Ute lands. First, the Secretary ordered the restoration of certain lands that had been ceded by the Confederated Bands in the 1880 Agreement. App.353 (citing 2 Fed. Reg. 2,563 (Dec. 2, 1937)). A June 15, 1938 Solicitor's opinion, M-29798, explained that those lands were eligible for restoration because "the lands were ceded to the United States to be disposed of by the United States in specified ways, the proceeds of the sale to be held for the benefit of the Indians," and legislators debating the IRA had viewed restoration of lands in that situation as an alternative to the proceeds from sale of the land. App.360 (quoting M-29798); *see also* App.239-245 [M-29798]. Second, the Secretary also restored to trust

status about 217,000 acres in the Uintah Reservation.  App.353 (citing 10 Fed. Reg. 12,409 (Oct. 2, 1945)), App.360-361.

In the 2018 M-Opinion, the Solicitor looked to the 1897 Act as the controlling statute that superseded any prior inconsistent statute.  App.362 & n.89. The 1897 Act, like the 1894 Act, did not "provide[] monetary benefit to the Tribe from the sale of lands within the Uncompahgre Reservation."  App.365.

The Solicitor disagreed "with the Tribe's reading that the 1880 agreement required the United States to compensate the Tribe for the future disposition of any and all areas where the Uncompahgre Utes may eventually be settled following the cession of the Colorado lands."  App.364.  He first pointed to the text providing that the Confederated Bands would be compensated only for lands "the title to which is … released and conveyed to the United States," and explained that none of the Confederated Bands had any "pre-existing rights" in the Utah Territory and there was no "designated area of the Uncompahgre Utes" in Utah before 1882. App.364 n.84.  Accordingly, "the payment provisions in section 3 of the 1880 agreement are more properly understood as concerning the future disposition of Colorado lands that had been ceded under the provisions of that agreement."  *Id*. The Solicitor pointed out that when Congress intended the Tribe to be compensated upon the opening of other Ute areas, "it did so explicitly," as in the 1902 Act applying to the Uintah Reservation.  App.364 & n.85.  Notably, "[u]nlike

15

the 1868 Treaty lands in Colorado that were ceded by the Confederated Ute Bands to the United States under the 1880 agreement, the area withheld in the 1882 Executive Order did not have the same genesis as lands where the United States recognized tribal title." App. 365 n.86. And an executive order does not create compensable property rights unless Congress separately recognizes ownership. App.365. Finally, the Solicitor explained: "Whatever controlling effect the 1880 agreement may have had over the general future disposition of lands, it was necessarily superseded by the express Congressional intent affecting the Uncompahgre Reservation in the 1897 Act." App.365.

The Solicitor also rejected the Tribe's other arguments. App.362-365.

### D. District Court proceedings

The Tribe filed a five-count Complaint on March 8, 2018. App.59-91. The district court granted Utah's motion to intervene in 2020. ECF No. 67. In 2021, the court dismissed the first, second, and third claims because they were barred by the applicable statutes of limitations or otherwise failed to state a claim. ECF No. 76. In 2022, the court dismissed the fifth claim as barred by the Quiet Title Act's statute of limitations. ECF No. 90. And in 2023, the court denied the Tribe's motion to amend the Complaint. ECF No. 97. The Tribe does not challenge those rulings in this appeal.

In its February 13, 2025 Order and Memorandum Opinion, the district court granted summary judgment to the United States and Utah. App.21-39. The court identified section 3 of the 1880 Act as the focus of the parties' disagreement, the Tribe arguing that section 3 required the government to pay the Tribe the proceeds from the sale of "the lands not so allotted" within the Uncompahgre Reservation in Utah that would be established by the 1882 Executive Order and the government arguing that section 3 entitled the Tribe to proceeds from the sale of the unallotted ceded lands within the 1868 Reservation in Colorado. App.30-31. The district court "agree[d] with the government's view for at least five reasons." App.31.

The district court then reviewed the 1894 and 1897 Acts authorizing the allotment of the Uncompahgre Reservation and the disposition of the remaining lands under the public land laws, concluding:

> Both the 1894 Act and the 1897 Act are silent as to any proceeds from cash entry, and so neither one grants compensable title to the Uncompahgre Utes. The Tribe does not argue otherwise; the thrust of its argument is that the 1880 Act granted title and that the 1894 and 1897 Acts did not take it away. But even if the Court, contrary to its analysis above, were to accept the first part of the Tribe's argument, it would reject the second. If the 1880 Act had given the Tribe compensable title to land in the Uncompahgre Reservation, the 1897 Act would have stripped it away.

App.36.

The court rejected the Tribe's argument that the Indian canons of construction required it to interpret the 1880 Agreement and the 1880, 1894, and

1897 Acts in the Tribe's favor because that interpretive principle does not apply to such unambiguous agreements and statutes.  App.38.

## SUMMARY OF ARGUMENT

I.     The Tribe's argument that the 1880 Act granted the Tribe compensable title in the Uncompahgre Reservation is based on multiple mischaracterizations of the statute.

A.     Contrary to the Tribe's repeated assertions, the 1880 Act did not provide any of the Confederated Bands with a replacement "reservation" that would be held in trust for the tribe.  Rather, the Confederated Bands agreed to accept individual allotments for their members and compensation for the cession of their reservation in Colorado established under the 1868 Treaty, and the 1880 Act implemented that agreement.

B.     Allotments for the Southern Utes and Uncompahgres were presumptively to be located within the 1868 Reservation, and alternatively to be located in New Mexico and Utah respectively only if sufficient agricultural land was not available at the specified locations in Colorado.  Section 3 of the 1880 Act is properly read to provide for compensation to the Confederated Bands from the proceeds of sales of the unallotted lands within the 1868 Reservation.  That interpretation is supported by other provisions of the 1880 Act.  There is no plausible way to read section 3 to also provide that the Uncompahgre Band would

receive the proceeds of sales of the unallotted lands in the area later withdrawn by the 1882 Executive Order.

C.      The 1868 Treaty right to compensable title in the 1868 Reservation cannot be carried over to the Uncompahgre Reservation because that right was "altered" by the 1880 Act, specifically the cession of the lands to which the Confederated Bands held compensable title.

D.      The Indian canons of construction are not properly applied to provide the Tribe with a right to compensable title in the Uncompahgre Reservation because the 1880 Agreement and 1880 Act were not ambiguous and there is no reason to believe that the Uncompahgre Band did not understand that it was to receive allotments for individual members and compensation for the sale of the 1868 Reservation.

II.      The 1882 Executive Order did not grant the Tribe compensable title to the entire Uncompahgre Reservation but instead withdrew an area within which allotments would be made as to which individual members would have compensable title.

III.      Neither the 1887 Act granting a railroad right of way nor any executive branch action between 1887 and 1894 demonstrates a commonly held understanding that Congress had granted the Tribe compensable title in the Uncompahgre Reservation in the 1880 Act.  The Tribe argues that post-enactment

history is generally irrelevant, and the inconclusive post-enactment evidence does not call into question Interior's interpretation of the 1880 Act.

IV.     The 1894 Act and 1897 Act expressly provided for allotment of the Uncompahgre Reservation and disposition of the unallotted lands under the public land laws, meaning that the United States would retain the proceeds of the sales. The 1897 Act is the controlling statute.  Even if the 1880 Act had granted the Tribe compensable title in the Uncompahgre Reservation, which it did not, the 1897 Act stripped the Tribe of that title.

V.      The Tribe misapprehends the Tenth Circuit's decisions in *Ute Indian Tribe v. Utah*.  Although the Tenth Circuit held that the 1894 and 1897 Acts had not diminished or disestablished the Uncompahgre Reservation, a majority of the en banc court held in 1985 that the United States held title to the unallotted lands for its own benefit.

## STANDARD OF REVIEW

This Court reviews the district court's order on cross-motions for summary judgment *de novo*.  *See Defenders of Wildlife v. Zinke*, 849 F.3d 1077, 1082 (D.C. Cir. 2017).

The APA directs the Court to uphold an agency's decision unless the Court finds it to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

Statutory interpretations are reviewed de novo. *Sierra Club v. FERC*, 153 F.4th 1295, 1304 (D.C. Cir. 2025). "In exercising such judgment, though, courts may ... seek aid from interpretations of those responsible for implementing particular statutes." *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 394 (2024). Executive Branch statutory interpretations "constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance." *Id.* (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)). "[I]nterpretations issued contemporaneously with the statute at issue, and which have remained consistent over time, may be especially useful in determining the statute's meaning." *Id.* *Skidmore* had explained that "[t]he weight of [an agency's] judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, [and] its consistency with earlier and later pronouncements." *Id.* at 388 (quoting *Skidmore*, 323 U.S. at 140).

## ARGUMENT

The parties agree that IRA § 3, 25 U.S.C. § 5103(a), authorizes restoration of "remaining surplus lands" to tribal trust status only if the tribe was entitled to proceeds from the sale of the lands. The Deputy Secretary correctly determined—for the reasons explained in the M-Opinion—that no statute granted the Tribe compensable title to the land within the Uncompahgre Reservation that was established by the 1882 Executive Order and opened to disposition under the

public land laws by the 1897 Act.  The Tribe failed in the district court to show any error in Interior's decision.  Its arguments on appeal similarly lack merit.  The Tribe fails to identify any act of Congress that provided the Tribe with the necessary compensable interest in the Public Domain Lands.  Nor has any court held that the Tribe holds such an interest in the Public Domain Lands.  Interior thus did not act contrary to law in denying the Tribe's request for restoration.

I.      **The 1880 Act did not grant the Ute Tribe compensable title in the Uncompahgre Reservation.**

The Tribe argues that section 3 of the 1880 Act clearly provided that the Tribe was to have compensable title to the lands that were to be "set apart" for the Southern Utes and Uncompahgres—whether within the 1868 Reservation or outside that Reservation.  Br. 38.  The Tribe declines to take a position on whether section 3 also gave the Tribe a right to compensation when the unallotted lands of the 1868 Reservation were sold.  *Id.* (that "is an interesting question, but is not the question presented here").  As explained below, section 3 plainly provides that the proceeds of the sale of the unallotted lands of the 1868 Reservation were to be paid to the Confederated Bands after specified deductions, and there is no plausible interpretation that section 3 also directs the Tribe to be compensated upon the sale of any not-yet-established reservation for the Uncompahgre Band.

The Tribe's alternative argument that all the rights of the 1863 and 1868 Treaties were carried over to the Uncompahgre Reservation by the fifth condition

of the 1880 Agreement, App.110, ignores the cession of the lands in Colorado to which it held compensable title.

**A. The 1880 Act did not require the government to establish a replacement "reservation" for the Uncompahgre Band in Utah.**

The Tribe's interpretation of section 3 starts with the incorrect premise that the 1880 Act provided for a replacement "reservation" for the Uncompahgre Band. *See*, *e.g.*, Br. 6 (the United States assertedly promised in the 1880 Act to "establish and protect a smaller Reservation for the Uncompahgre Band in Colorado if practicable, or in Utah"); *id*. (Congress directed the President to "create [a] replacement Reservation" in Utah); *id*. at 7 ("the United States agreed to 'set apart' a new Reservation for the Uncompahgre Band"); *id*. at 8 (President Arthur had a "duty under the 1880 Act" to "'set apart' [a] new Reservation for the Uncompahgre Band"). But the 1880 Act nowhere provided for a new "reservation" to be held in trust for any of the Confederated Bands. The only references to "reservation" in the 1880 Act were to the 1868 Reservation in Colorado and to the 1861 Uintah Reservation in Utah. App.109, 110, 113.

The Tribe quotes the 1880 Act at length but omits significant provisions making clear that the statute provided for *allotments to individual members* of the Confederated Bands, not replacement reservations to be held in trust by the government for the Bands. *See* Br. 1-4. Notably, the 1880 Agreement (included as

Section 1 of the 1880 Act) provided for "[a]llotments in severalty" "[t]o each head of a family one-quarter of a section" of agricultural land (*i.e.*, 160 acres) "with an additional quantity of grazing land not exceeding one-quarter of a section," and half those areas to single persons over 18 and to persons under 18. App.109. The 1880 Agreement further provided that the government would issue patents in fee simple for the allotments but that the allotments would "remain inalienable and not subject to taxation for the period of twenty-five years" or such longer period as the President sees fit. App.110. The lands that were to be allotted in severalty to the Bands' members were simply described as "lands," not as a "reservation."

The phrase "set apart" was used to reference parcels for allotments and Indian agencies. After describing the areas where the Bands were to settle and the acreage of the allotments to be made, the 1880 Agreement provided that the government "cause the lands *so set apart* to be properly surveyed and to be divided among the said Indians in severalty in the proportion hereinbefore mentioned." App.109-110 (emphasis added); *see also* App.112 (section 3 of the 1880 Act directing the "survey" of "a sufficient quantity of land in the vicinities named in said agreement, to secure the settlement in severalty of said Indians"). The 1880 Agreement also provided that lands "be set apart" for agencies for the Southern Utes and Uncompahgres at "suitable points" near their settlements. App.110. But the 1880 Act nowhere directs the government to "set apart" replacement

24

reservations.  The Tenth Circuit has explained that "[n]othing in the 1880 Act *required*" President Arthur to withdraw a reservation for the Uncompahgre Band. *Ute Indian Tribe v. Utah*, 773 F.2d 1087, 1097 (10th Cir. 1985) (en banc) (*Ute III*) (Seymour, J., concurring) (emphasis added).

Although the Tribe acknowledges that allotments for the Uncompahgres could have been made within the 1868 Reservation (*see* Br. 6, 38), it repeatedly suggests that Congress in 1880 intended to remove the Band to Utah.  For example, the Tribe selectively quotes from a House debate, 10 Cong. Rec. 176 (December 18, 1894), in support of its assertion that "Congress was directing the Executive Branch to remove the Uncompahgre Band from its existing treaty Reservation and was directing the Executive Branch to create the new Reservation for the Uncompahgre Band."  *See* Br. 8-9.  Following the September 1879 murder of Indian agent N.C. Meeker and employees of the White River Agency, *see* App.109, the House debated a Joint Resolution (S. No. 51) which authorized the Secretary of the Interior to enter into an agreement with the Ute Indians in Colorado "for the extinguishment of their title to their reservation in said State, and to obtain their consent to their removal and settlement in the Indian Territory or elsewhere." 10 Cong. Rec. at 178.  Different views were expressed.  The House Committee on Indian Affairs had proposed to amend the Joint Resolution to instead authorize "their removal and settlement in some other suitable place in the

State of Colorado." *Id*. Congressman Haskell spoke in favor of settling the Utes "upon some other portion of their present reservation," *id*. at 181, while Congressman Springer argued that "[a] suitable reservation can be found elsewhere," *id*. at 179. The House "[came] to no resolution" on the joint resolution.[4] *Id*. at 185.

Thereafter, representatives of the Confederated Bands negotiated the 1880 Agreement with the government in Washington, D.C. on March 6, 1880 and Congress enacted the additional provisions of the 1880 Act on June 15, 1880. The 1880 Agreement and 1880 Act unambiguously provide that members of the Uncompahgre and Southern Ute Bands would presumptively be allotted lands within the Colorado Reservation. The presumptive location of the allotments for the Uncompahgre Utes was emphasized in the second condition of the 1880 Agreement by referring to the Uncompahgre Utes as "those settling on the Grand River and vicinity." App.110. It was only the members of the White River Band, who were understood to be the perpetrators of the Meeker massacre, who would necessarily be removed from Colorado to Utah.

---

[4] The Tribe argues that reservation diminishment/disestablishment cannot be premised on the general expectation in the late 19th century that tribal communal ownership would eventually end. Br. 9-10. As explained in Part V below, however, the issue here is whether Congress granted the Uncompahgre Band a compensable interest in the 1882 Executive Order Reservation. It did not.

The Tribe makes much of a colloquy between the district court and government counsel at the December 16, 2024 hearing during which the court appeared to think that Congress had directed the Uncompahgre Band's removal from Colorado.  Br. 29-31 (discussing App.375-376 [ECF No. 120, Tr. 18-19]).  The court stated that "[i]t doesn't seem to me to make sense to talk about ['lands not so allotted'] as land that the Tribe was leaving in Colorado."[5]  App.375; *see also* App.376, 377 [Tr. 19, 20] (similar observations).  But despite some calls to remove all Utes from Colorado, Congress determined in the 1880 Act to allow members of the Uncompahgre and Southern Ute Bands to remain on the 1868 Reservation unless sufficient agricultural land for allotments could not be found for them there.

In its opinion, the district court well analyzed the relevant statutes and their historical context, but it misunderstood one point.  It said that "*Congress determined that there was not enough agricultural land in Colorado, so it directed the Uncompahgre Utes to land in eastern Utah.*"  App.24 n.1 (emphasis added) (citing App.199 [Report of the House Committee on Indian Affairs, H.R. Rep. No. 53-660, at 2 (1894)]).  But that House Report correctly noted that the 1880 Act had

---

[5] The district court was probing the government's arguments but, contrary to the Tribe's characterization, the court did not characterize the government's position as a "last-ditch argument [that] was contrary to rules of statutory interpretation." *See* Br. 29.

directed the President to appoint commissioners to allot the lands. It was the commissioners appointed under the 1880 Act—not Congress—who determined that there was not enough agricultural land in the vicinity of the confluence of the Grand River and Gunnison River. *See Ute I*, 521 F. Supp. at 1097; *see also* App.156-157 [Indian Claims Commission Petition] (asserting that the commissioners "reported there were not sufficient lands available for … the Uncompahgre Utes in the vicinity of the Grand River, near the mouth of the Gunnison River in Colorado, and recommended that the Uncompahgre Utes be located in the State of Utah"). The Tribe does not dispute this fact. The Tribe asserted in the district court that the commissioners lied because they wanted to retain the more fertile land in Colorado. *See* App.24 n.1. The district court concluded that it did not matter to its analysis whether the commissioners lied, "and for simplicity, the Court will proceed as though the 1880 Act simply called for the Uncompahgre Utes to settle in Utah." *Id*.

Based on that interpretation—assumed for the sake of argument—the district court appeared to state that the provisions in section 3 of the 1880 Act before the phrase "the lands not so allotted" "clearly refer to the Utah lands on which the Utes were to settle," and added that "it makes sense to think that the remaining parts of Section Three, including 'the lands not so allotted,' might also refer to that area." App.30. But despite the unwarranted assumption in the district court's analysis, it

still correctly concluded that section 3, read as a whole, provided for the Confederated Bands to receive the proceeds from the sale of the *1868 Reservation*, not the Uncompahgre Reservation established under the 1882 Executive Order.

As explained in Part I.B below, when one reads section 3 with the correct premise—that Congress provided that the Uncompahgres and Southern Utes would presumptively be allotted land within the 1868 Reservation—the "lands not so allotted" are naturally understood to be the 1868 Reservation.

**B.     Section 3 unambiguously provided for proceeds from the sale of the unallotted lands on the *1868 Reservation* to be paid to the Confederated Bands.**

As summarized above (pp. 13-16), Interior thoroughly explained in the M-Opinion its rationale for rejecting the Tribe's principal argument—that section 3 of the 1880 Act granted it compensable title to the 1882 Executive Order Reservation—beginning with the text of section 3.

The Tribe argues that it has compensable title to the undisposed-of lands within the Uncompahgre Reservation under "the plain language" of the 1880 Act. Br. 21-24; *see also* Br. 16.  But in its excerpt of section 3 it omits the critical phrase highlighted in the M-Opinion: "the title to which is, by the said agreement of the confederated bands of the Ute Indians, and this acceptance by the United States, released and conveyed to the United States."  *See* Br. 22.  The M-Opinion correctly explained that the omitted phrase refers to the 1868 Reservation, not the

29

Uncompahgre Reservation. The omission completely undermines the Tribe's plain-language argument. And the Tribe's assertion that the government did not base its conclusion that the Tribe lacked compensable title on "the language of the 1880 Act" ignores the M-Opinion's analysis. *See* Br. 24.

The district court described the parties' competing interpretations of the phrase "the lands not so allotted" in section 3. App.30. Whereas the Tribe argued that such lands were within the future 1882 Executive Order Reservation, the government argued that they were within the 1868 Reservation based on the "language immediately following that phrase": "the title to which is, by the said agreement … released and conveyed to the United States." *Id*. The government pointed out that the Confederated Bands "gave up their rights to all land outside of Colorado in the 1868 Treaty, and so they could not, in the 1880 Agreement, have 'release[d] and convey[ed]' title to any land in Utah." *Id*. The Tribe surprisingly asserts, without citation to the record, that "[t]he United States and the Tribe agreed that the [language quoted above] from section 3 of the 1880 Act referred to the land on the … Uncompahgre Reservation." Br. 27. That assertion is incorrect. The government clearly took the position in the M-Opinion and in the district court that the provision applied to unallotted land in the 1868 Reservation that was ceded to the United States under the 1880 Act.

The district court articulated five reasons for agreeing with the government's interpretation.  App.31-34.  The Tribe does not dispute the first two reasons—which is sufficient reason to affirm the district court's judgment—and the Tribe's criticisms of the other reasons are unpersuasive.  *See* Br. 29-32.

The district court's first reason was that the Supreme Court has twice interpreted section 3 to recognize the Confederated Bands' compensable title only in the 1868 Reservation and not any other lands.  App.31.  The Supreme Court first so held in *Confederated Bands of Ute Indians v. United States*, 330 U.S. 169 (1947), in which it rejected a claim to compensation for a strip of land north of the 1868 Reservation that had been set aside by an 1875 Executive Order with the intent to correct a surveying error:

> The only lands for which Congress agreed in 1880 to compensate the Indians were those that 'the title to which' the Indians then 'released and conveyed to the United States.'  They could only release and convey the lands that belonged to them, and only the lands given to them by the original 1868 treaty belonged to them.

*Id*. at 178.  And the Supreme Court similarly concluded in *United States v. Southern Ute Tribe or Band of Indians*, 402 U.S. 159, 162-63 (1971), that "[t]he central feature of the Act of 1880 was the termination of tribal ownership in the reservation lands, and the limitation of Indian ownership to such lands as might be allotted in severalty to individual Indians."  The Tribe does not argue that these cases are inapplicable or distinguishable.

Second, the district court noted two provisions of the 1880 Act that support the government's interpretation. App.32. Section 1 (the 1880 Agreement) "required the Utes to 'cede to the United States all the territory of the present Ute Reservation in Colorado.'" *Id*. (quoting App.109). And the final proviso in section 3—directing the sale of parcels "upon which are located improvements to be appraised, as provided for in section two of this act"—unambiguously refers to the 1868 Reservation. *Id*. (quoting App.113). The Tribe does not dispute the district court's interpretation of these provisions.

The district court's third reason was that "the lands not so allotted" in the Uncompahgre Reservation could not have been defined in 1880 because "that Reservation did not yet exist." App.32. The Tribe criticizes the district court's reasoning, pointing out that "the lands not so allotted" in the 1868 Reservation similarly "could not be identified in 1880." Br. 30. It is true that "the lands not so allotted" in the 1868 Reservation would not be entirely identifiable until the survey of the allotments to be made for the Uncompahgre Utes and Southern Utes— presumptively within the specified limited areas of the 1868 Reservation—but the large area of the 1868 Reservation that was not proposed for allotment was identifiable in 1880. In contrast, Congress could not have predicted in 1880 whether there would be *any* "unallotted lands" in Utah or New Mexico even if the allotments to the Uncompahgre and Southern Utes were to be made there as the

commissioners potentially could have surveyed the 160-acre and 80-acre allotments on the public domain lands in Utah and New Mexico without the withdrawal of a larger area. The Tribe's four-bullet timeline simply has no basis in section 3 of the 1880 Act. *See* Br. 30. As explained in Part I.A above, the 1880 Act did not require the President to create a replacement reservation for the Uncompahgre Band.

The district court's fourth reason for favoring the government's interpretation was that section 3 required the Utes to pay for allotments outside the 1868 Reservation at a rate of $1.25 per acre, which was inconsistent with a claim to compensable title in the Uncompahgre Reservation. App.33. The Tribe argues that this reasoning was "flaw[ed]" because the 1880 Act "clearly stated that the Band or its members were required to pay the Tribe [sic] for the allotted land— whether that land would have been near Grand Junction or whether, as it turned out, the land was in Utah." Br. 32. That is incorrect. Section 3 required payment to the United States only for the allotted parcels "which may be ceded to them [*i.e.*, to individual band members] by the United States *outside of their reservation*." App.113 (emphasis added).

The district court's fifth reason was that "subsequent history shows that the Treasury fund created under Section Three consisted of proceeds from sales of land in the Ute Reservation in Colorado, not land in the Uncompahgre Reservation

in Utah." App.33. The court noted that the fund "contained more than $1,700,000 in proceeds as of 1894." App.34 n.5 (citing App.200 [H.R. Rep. No. 53-660, at 3]). The district court pointed out that the 1894 Act provided that the payments for the allotments within the Uncompahgre Reservation were to be taken "from the fund now in the United States Treasury realized from the sale of their lands in Colorado as provided by their contract with the Government" (*i.e.*, the 1880 Agreement). App.33-34 (quoting App.117). And it also pointed to the Act of July 28, 1882, 22 Stat. 178 (1882 Act), which directed the Secretary of the Interior to delineate the land of the Southern Utes in the 1868 Reservation and to open for sale the land of the White River Band and Uncompahgre Band, confirming that "section 3 of the [1880 Act]" provided for the disposal of the lands of the 1868 Reservation, not some to-be-established reservation elsewhere. App.34 (quoting App.116).

The Tribe argues generally that subsequent statutes do not have "persuasive value" in this case. Br. 12 n.6; *see also* Br. 32-33 (courts should "look[] to the language used by the Congress that passed the statute"). But its only specific criticism of the district court's fifth reason is that it "relied upon statements by a Congressman in 1894 to determine the meaning of the 1880 Act." Br. 33 (citing the 1894 House Report). That is not a fair characterization. The district court permissibly considered the historical fact that a fund was created from proceeds of

the sale of the 1868 Reservation to test its interpretation of the text of the 1880 Act. *See*, *e.g.*, *Delaware Dep't of Nat. Res. & Env't Control v. EPA*, 895 F.3d 90, 99 (D.C. Cir. 2018) (a party may "avoid a literal interpretation" of a statute by "show[ing] … that, as a matter of historical fact, Congress did not mean what it appears to have said").  And although the Tribe asserts that there were various "false statements" in the House Report, it does not contest the pertinent historical fact that the sale of lands within the 1868 Reservation had resulted in a fund which could be used to pay for allotments to members of the Uncompahgre Band within the 1882 Executive Order Reservation.  *See* Br. 33.

At pages 24-29 of its Brief, the Tribe challenges the interpretation of section 3 in the M-Opinion, the government's district court briefing, and the district court's opinion for four reasons, none of which has merit.

First, the Tribe argues, without a record citation, that the government erred in asserting that the lands that were "set apart" were "public lands."  Br. 24.  It is unclear how the Tribe thinks the government erred, including in the briefs cited at the bottom of page 24.  As explained in Part I.A above, the 1880 Act used the phrase "set apart" in connection with the parcels that would be allotted to individual Indians or used for the government agencies to be established for the Southern Utes and Uncompahgres.  The allotments for the Southern Utes and Uncompahgres could either be made within the 1868 Reservation or from public

lands in New Mexico or Utah. Once a parcel of public land was "set apart" as an allotment, it would no longer be public land; the allottee would have a compensable interest in the allotment.

Second, the Tribe criticizes the government's filings in the district court. Br. 26-29. Specifically, the Tribe asserts that the United States "wrongly claim[ed] the Executive Branch had 'plenary power' over tribal land" and "also argued that federal courts lack the power to interpret acts of Congress," citing the Federal Defendants' Response to Plaintiff's Motion to Amend, ECF No. 95 at 9-10 (filed Nov. 4, 2022). Br. 26. The cited filing does not discuss "plenary power" or argue against judicial power to interpret acts of Congress, and it is unclear what other filing the Tribe may be referencing. In any event, this appeal involves only the Tribe's APA challenge to the 2018 Decision and M-Opinion and criticisms of these filings do not call into question Interior's rationale.

Third, the Tribe asserts that it "does not view any of the United States' arguments [in its summary judgment brief] to be based upon the rationale of M-37051" and states that it "will discuss" in its reply brief whether the argument the United States makes in this response brief "is permitted based upon M-37051." Br. 27 n.9. The criticism of the government's summary judgment brief, ECF No. 103 (filed April 26, 2024), is unwarranted, and this Court should reject the Tribe's baseless suggestion that it is not subject to this Court's rule requiring appellants to

present their arguments in the opening brief. *See Al-Tamimi v. Adelson*, 916 F.3d 1, 6 (D.C. Cir. 2019) ("A party forfeits an argument by failing to raise it in his opening brief.").

Fourth, the Tribe quotes the first proviso clause of section 3 and argues that it "is the exact definition of 'compensable title.'" Br. 28-29. Congress there directed that the United States would be entitled to recoup its expenditures for the benefit of the Confederated Bands under the 1880 Act out of the proceeds from the sale of the unallotted lands within the *1868 Reservation*, as well as to deduct a charge of $1.25 per acre for any allotments the United States granted to members of the Confederated Bands outside of the 1868 Reservation, before depositing "the remainder, if any" in the Treasury for the benefit of the Confederated Bands. App.112-113. That clause does provide for compensable title, but as to the *1868 Reservation* not the Uncompahgre Reservation. Contrary to the Tribe's assertion, the Solicitor adequately explained his rationale for that interpretation. *See* Br. 29.

### C. The fifth condition of the 1880 Agreement did not carry over the Tribe's compensable title in the 1868 Reservation to the Uncompahgre Reservation.

The Tribe misplaces reliance on the fifth condition of the 1880 Agreement, App.110. *See* Br. 6. That condition "expressly reaffirmed" the following provision of the Act of April 29, 1874, 18 Stat. 36, 37: "The United States agrees to set apart and hold, as a perpetual trust for the Ute Indians, a sum of money or its

equivalent in bonds, which shall be sufficient to produce the sum of twenty-five thousand dollars per annum, which sum … shall be disbursed or invested at the discretion of the President, or as he may direct, for the use and benefit of the Ute Indians forever." App.110. And it provided more generally that "[a]ll provisions of the [1868 Treaty] … , *not altered by this agreement*, shall continue in force." *Id*. (emphasis added).

The Tribe relies on *Jones v. United States*, 846 F.3d 1343 (Fed. Cir. 2017), which held that the "bad men" provision of the 1868 Treaty applied to assertedly criminal acts committed against tribal members in Utah. Br. 6-7. The court did not address the phrase "not altered by this agreement," but the 1880 Agreement did not appear to alter the "bad men" provision. In contrast, the Confederated Bands' compensable title in the 1868 Reservation was altered by the 1880 Agreement through the Confederated Bands' cession of that land to the United States in return for individual rights in allotments and monetary compensation. *Jones* is thus distinguishable.

### D. The Indian canons of construction do not require interpreting the 1880 Agreement to grant a replacement reservation with compensable title.

The Tribe argues that the Uncompahgre Band would have understood that in the 1880 Agreement the government was granting it a replacement reservation— not just individual allotments and monetary compensation. Br. 39-41. As

explained in Part I.A above, there is no basis for that interpretation in the text of the Agreement.

The Tribe's primary basis for asserting that the Uncompahgre Band nonetheless understood in 1880 that it would receive a replacement reservation is *Ute III*, 773 F.2d at 1092. Br. 40. The Tribe mischaracterizes that decision. The Tenth Circuit observed there that "[t]here was never an understanding on the part of the Tribe that they would lose their reservation [*i.e.*, the Uncompahgre Reservation] as a result of the 1897 Act." It did not suggest, as the Tribe asserts, "that the Tribe did not understand that the 1880 Act was meant to take the Uncompahgre's more fertile and larger homeland in Colorado in exchange for a few barren allotments in Utah." *See id*. The Tribe's further assertion that "the Tribe understood that, as expressly stated in the 1880 Act, the United States was expelling the Tribe from its home in Colorado" is also unpersuasive. As explained above, the Uncompahgre Band expected to receive allotments in the Grand Junction area which had fertile land within or along the edge of their aboriginal territory, but the commissioners appointed under the 1880 Act surprisingly reported that there was not sufficient agricultural land for allotment in that area. *See also* Br. 10 & n.5.

The Tribe later tries to support its assertion that the Uncompahgre Band understood that it was to receive a replacement reservation by asserting that "[t]he

debates regarding allotment were from about 1880 to 1887," Br. 37, and that, as of 1880, "the existing policy" was still to "create[e] a tribal reservation from which non-Indians were generally barred," Br. 36. The Tribe criticizes as "flatly wrong" the district court's statement that, when the 1880 Act was passed, "allotment was the then-common practice of dividing 'reservation land among individual Indians with a view toward their eventual assimilation.'" Br. 36 (quoting App.24). The Tribe's suggestion that the Confederated Bands would not have understood the concept of allotment in 1880 does not stand up to scrutiny.

The treatise cited by the Tribe does not support the suggestion that the debate about allotment and assimilation only began about 1880. *See* Br. 37 (citing Cohen's Handbook of Federal Indian Law § 1.04, at 77 (2005 ed.)). In fact, that treatise identified the end of treaty-making in 1871 as the significant point after which "[t]he theme of Indian policy for the remainder of the nineteenth and first quarter of the twentieth century was 'civilization and assimilation.'" Cohen's Handbook § 1.04, at 76-77. Moreover, the treatise pointed out that "[t]he allotment concept was not new," as "Indian lands had been allotted as early as 1633" and "[m]any treaties reserved certain tracts of lands not for the tribe but for designated individual Indians or families under various forms of tenure." *Id.* at 77. The treatise noted that "[t]he passage of the General Allotment Act of 1887 culminated

years of debate on Indian land ownership and distribution," but did not state that the debates only began about 1880. *Id.*

The Tribe invokes "the general rule that doubtful expressions are to be resolved in favor of the weak and defenseless people who are the wards of the nation." Br. 41 (quoting *McClanahan v. Arizona State Tax Comm'n*, 411 U.S. 164, 174 (1973) (cleaned up)). But the canons of construction requiring resolution of ambiguities in favor of Indians do not apply when a statute's language is clear. *Negonsott v. Samuels*, 507 U.S. 99, 110 (1993); *see also South Carolina v. Catawba Indian Tribe*, 476 U.S. 498, 506 (1986) (they do not "permit reliance on ambiguities that do not exist; nor … permit disregard of the clearly expressed intent of Congress"). "[E]ven Indian treaties cannot be re-written or expanded beyond their clear terms to remedy a claimed injustice or to achieve the asserted understanding of the parties." *Choctaw Nation of Indians v. United States*, 318 U.S. 423, 432 (1943). As the district court stated, although "'[s]ome might wish' that Congress had acted differently," "no canon allows this Court to 'remake history' by reading into these enactments a provision they do not contain." App.39 (*quoting DeCouteau v. District County Court*, 420 U.S. 425, 449 (1975)).

The 1880 Agreement must be interpreted as drafted because its language is clear and, in any event, there is no reason to believe that the Uncompahgre Band did not understand its terms as drafted.

41

## II.     The 1882 Executive Order did not grant the Tribe compensable title in the Uncompahgre Reservation.

The Tribe does not appear to argue that the 1882 Executive Order, in and of itself, granted it compensable title.  The M-Opinion correctly explained that executive orders establishing reservations "do not convey vested, compensable property rights beyond a right of occupancy absent further specific recognition of ownership by Congress."  App.365 & n.87 (citing *Karuk Tribe of California v. Ammon*, 209 F.3d 1366, 1374-76 (Fed. Cir. 2000), and *Confederated Bands of Ute Indians*, 330 U.S. at 176-79).  The Tribe does not challenge that legal principle.  Unlike the Uintah Reservation, Congress never enacted a statute granting the Tribe compensable title to the Uncompahgre Reservation.

President Arthur permissibly exercised his authority in setting apart a reservation in northeast Utah in preparation for surveying and patenting allotments for individual members of the Uncompahgre Band.  The commissioners appointed under the 1880 Act had recommended that "[u]ntil the Indians can be made somewhat familiar with their new relations, it is … of vital importance to maintain the exterior boundary limits of the lands upon which they dwell as a reservation, and within which white men may not be allowed to locate."  *Ute I*, 521 F. Supp. at 1097 (quoting Report of the Commissioner of Indian Affairs, 1881, at 383).  The 1882 withdrawal was *in accord with* the 1880 Act, but, as the Tenth Circuit explained in *Ute III*, 773 F.2d at 1097, it was not *required by* the 1880 Act.

Interior further explained in the M-Opinion that, in 1882, the United States withheld from sale and set apart "an area of public domain lands" "for the prospective location of the Uncompahgre Band" and that "[n]either the Confederated Bands nor Uncompahgre Band had any pre-existing title interest in the area reserved under the 1882 Executive Order." App.349, 350-351; *see also* App.364-365 ("There was no indication in the 1880 agreement or the 1882 Executive Order that the public domain lands that would subsequently be withheld as a reservation for the Uncompahgre Utes had its origin as a land cession.").

Although the Tribe does not directly challenge Interior's conclusion, it appears to suggest that the Uncompahgre Band held aboriginal title to that land by broadly asserting that the "homeland" of the bands that are now part of the Ute Indian Tribe of the Uintah and Ouray Reservation extended from "present-day Denver to present-day Salt Lake City." Br. 4 & n.1. That suggestion is incorrect. As explained above (pp. 4-5), the Uncompahgre Band described in the 1863 Treaty the area to which it claimed aboriginal title, an area which did not include any land in Utah.

III. **Congressional and administrative actions between 1882 and 1894 do not support the Tribe's claim of compensable title in the Uncompahgre Reservation.**

As noted, the Tribe does not believe that post-1880 history is relevant in this case to Congress's intent in the 1880 Act. Br. 12 n.6. But it argues that, if any

subsequent history is relevant, the Act of March 3, 1887, 24 Stat. 548 (1887 Act), is "most persuasive" as "the first relevant act of Congress after the 1880 Act."[6] Br. 35. According to the Tribe, the 1887 Act "authorized [the Utah Midland Railway] to enter the Reservation AND it required the railroad to pay the Tribe for the land that the railroad needed to occupy," indicating that Congress believed that the Tribe had compensable title in the Uncompahgre Reservation. *Id*. That conclusion is unwarranted.

The 1887 Act granted the railroad a right of way across the Uncompahgre Reservation and Uintah Reservation which were "occupied by the Tabequache Utes, Uintah Utes, White River Utes, and other tribes of Indians." 24 Stat. at 548. It authorized the President, "in his discretion," to require "the consent of the Indians." 24 Stat. at 549. And it required "the Secretary of the Interior to fix the amount of compensation to be paid the Indians for such right of way and materials, … and also to ascertain and fix the amount of compensation to be made individual members of the tribe for damages sustained by them by reason of the construction of said road." *Id*.

The M-Opinion explained that the railroad undertook surveys and mapping but did not construct the track, and that it is unknown whether any compensation

---

[6] In fact, the 1882 Act discussed above (p. 34) is the first relevant statute after the 1880 Act.

44

was ever determined or paid.  App.351.  The Solicitor concluded that the 1887 Act

was irrelevant to the question whether the Public Domain Lands were eligible to be

restored to the Tribe under IRA § 3 because, even if compensation had been paid

for the right of way, IRA § 3 "focuses on statutes that opened the reservation to

disposition where sales proceeds will be credited to the tribe."  App.365.  The 1897

Act, not the 1887 Act, is thus "the operative legislation."  *Id*.  The Tribe argues that

it is "immaterial" whether the railroad was built, but it does not dispute the

Solicitor's conclusion that the 1897 Act is the controlling statute.  Br. 13 n.6.

The district court fairly observed that "[t]he 1887 Act might be evidence of a

view in Congress that the Uncompahgre Utes owned the land and were entitled to

compensation for the right of way, or it might be evidence of a view that they

merely occupied the land but should be compensated for suffering the

inconvenience of the railway."  App.28 n.2.  But since "[t]he Parties do not put

much weight on the 1887 Act," the court said that it would "follow suit."  *Id*.  The

Tribe calls the district court's approach "illogical," but it does not explain why the

compensation provision of the 1887 Act does not plausibly allow for the inference

that Congress in 1887 understood that the Uncompahgres had only a right of

occupancy without compensable title.  *See* Br. 13 n.6.  Its language was broad

enough to allow the Secretary to determine that compensation was due to the Tribe

for the right of way across the trust lands of the Uintah Reservation but that

compensation was due only to any allottees within the 1882 Executive Order Reservation individually affected by the railroad.

The Tribe then discusses the Act of May 24, 1888, 25 Stat. 157, providing for compensation to the Tribe for the taking of gilsonite lands in the Uintah Reservation. Br. 13. But since the Uintah Reservation was unquestionably held in trust for the Tribe, that statute sheds no light on whether the Tribe had compensable title in the Uncompahgre Reservation. *See* Br. 13. The Tribe also discusses legislation proposed in 1890 and 1892 to restore gilsonite lands in the Uncompahgre Reservation to the public domain. Br. 13-14. This discussion comes from the history of the Uncompahgre Reservation set forth in *Ute I*, 521 F. Supp. at 1100-01, which addressed the question whether the Uncompahgre Reservation had been disestablished or diminished. The Tribe does not explain how such failed legislation reveals whether Congress intended to grant the Tribe compensable title in that reservation in the 1880 Act.

The Tribe next asserts that "[d]uring that time period, there were multiple statements from the Executive Branch which showed that the Tribe held compensable title." Br. 14. But the Tribe identifies only one such statement—a December 30, 1892 letter from Commissioner of Indian Affairs Morgan to the Secretary of the Interior expressing his view that the Uncompahgres could lease land under the Indian Leasing Act, 26 Stat. 794 (Feb. 28, 1891). Br. 14. And the

Tribe fails to mention that Interior's lawyer took a contrary view. As the district court recounted in *Ute I*, 521 F. Supp. at 1101 & n.89, Assistant Attorney General Hall advised the Secretary, by letter dated October 23, 1893, that, in contrast to the Uintah Reservation, "[i]t is clear to my mind that the Uncompahgre Utes have not title to the lands they occupy." *Id*. Instead, "they occupy these lands as a temporary reservation, until such time as the President may require them by virtue of the agreement, and the Act of 1880, to take their allotments within the limits of said reservation." *Id*. The M-Opinion noted this correspondence.[7] App.351 n.12.

In sum, the statutes, proposed legislation, and Executive Branch statements discussed above do not demonstrate any error in Interior's decision that the 1880 Act did not grant the Tribe compensable title in the 1882 Executive Order Reservation.

**IV.    The 1894 Act and 1897 Act did not grant the Tribe compensable title to the Uncompahgre Reservation and, if the 1880 Act is interpreted to have granted the Tribe compensable title, Congress took that title in the 1894 and 1897 Acts.**

The M-Opinion described the terms of the 1894 Act, which resulted in no allotments, and Congress's renewed effort in the 1897 Act to provide allotments to the Uncompahgres and to open the unallotted lands "for location and entry under all the land laws of the United States" as of April 1, 1898. App.351-352 (quoting

---

[7] The Tribe's assertion that the Solicitor and the district court "cherry-picked" Executive Branch statements is unwarranted. *See* Br. 25, 45.

30 Stat. 87). Neither the 1894 Act nor the "control[ling]" 1897 Act "provided for payment or other specific benefit to the Tribe resulting from the sale of the un-allotted Uncompahgre lands." App.352. After rejecting the Tribe's arguments based on the 1880 Act and other authorities, the Solicitor reiterated that "the Department must give effect to later statutes disposing of the Uncompahgre Reservation, in particular the 1897 Act." App.365. "Whatever controlling effect the 1880 agreement may have had over the general future disposition of lands, it was necessarily superseded by the express Congressional intent affecting the Uncompahgre Reservation in the 1897 Act." *Id*.

The district court well explained the provisions and legal effect of the 1894 and 1897 Acts, and contrasted them with other statutes that opened reservations for sale but required that proceeds be used for the benefit of the tribes, including a 1904 statute opening the Crow Reservation and the 1902 Act opening the Uintah Reservation. App.35-38.

At pages 37-38, the Tribe criticizes the district court's analysis on two grounds, neither of which is persuasive. First, it argues that "Congress can only terminate a tribe's compensable title through clear and unequivocal acts," not "[s]ilence." Br. 37. It bases its claim to compensable title on the false premise that the 1880 Act "set apart" the entire Uncompahgre Reservation for the Band, which is refuted in Part I.A above. Moreover, the 1894 Act expressly provided that the

unallotted lands were to be "restored to the public domain" and "open to entry under the homestead and mineral laws of the United States." App.117. And the 1897 Act, using equivalent clear language, provided that the unallotted lands were to "be open for location and entry under all the land laws of the United States." App.118. Contrary to the Tribe's argument, both statutes were "clear and unequivocal" in providing that proceeds from disposition of the unallotted lands would be retained by the United States, unlike section 3 of the 1880 Act.

Second, the Tribe asserts that there is no evidence that anyone homesteaded on the Uncompahgre Reservation after 1897. Br. 37. Although the Tribe does not explain the significance of this assertion, it may be suggesting that the government believed that the disposition of the unallotted lands within the Uncompahgre Reservation was governed by section 3 of the 1880 Act—which provided "[t]hat none of said lands, whether mineral or otherwise, shall be liable to entry and settlement under the provisions of the homestead law; but shall be subject to cash entry only in accordance with existing law," App.112—rather than the 1897 Act. The M-Opinion reports, however, that homestead patents were issued for the Uncompahgre Reservation after 1897. App.352 n.15 ("The BLM's records reflect that there were approximately 94 Homestead Act and 29 Stock Raising Homestead Act Patents issued between 1911 and 1945."). The Tribe offers no reason to question Interior's conclusion that the 1897 Act is the governing statute.

**V.    The *Ute Indian Tribe v. Utah* decisions do not hold that the Tribe had compensable title.**

The Solicitor considered the series of district court and Tenth Circuit decisions in *Ute Indian Tribe v. Utah*, No. 75-cv-408 (D. Utah), concerning the jurisdictional status of the lands within the boundaries of the Uintah and Ouray Reservation.  App.349 & n.3.  He "conclude[d] that those decisions do not address, much less resolve, the separate inquiry of whether the Tribe has any ownership interest in these lands or whether section 3 of the IRA is an appropriate source of authority for the 'restoration' they request."  App.350; App.355 (same).  The M-Opinion explained that the Tenth Circuit "concluded that the Uncompahgre Reservation remains intact" in *Ute III*, 773 F.2d at 1092.  App.355.  The court "considered and rejected arguments that the 1894 and 1897 Acts disestablished or diminished the Uncompahgre Reservation, finding no explicit language of cession in the Acts or in the legislative history."[8]  *Id*.

But while the Tenth Circuit has held that the land within the exterior boundaries of the Uncompahgre Reservation is "Indian country" for jurisdictional

---

[8] The United States took the position in *State of Utah v. Ute Indian Tribe*, S. Ct. No. 85-1821, that the Uncompahgre Reservation was disestablished by the 1897 Act but that Supreme Court review of *Ute III* was not warranted.  *Ute III* remains circuit precedent.  Following *Hagen v. Utah*, 510 U.S. 399 (1994), holding that the Uintah Reservation was diminished by the 1902 Act, the Tenth Circuit reaffirmed its holding that the Uncompahgre Reservation was not disestablished.  *Ute Indian Tribe v. Utah*, 114 F.3d 1513, 1519, 1529 (10th Cir. 1997) (*Ute V*).

purposes, the Solicitor explained that "should not be confused with land ownership." App.355 n.37. The distinction "relies on the concurring opinion joined by a majority of the judges in *Ute III* that 'title and reservation status are not congruent concepts.'" App.363 (quoting 773 F.2d at 1097); *see also* App. 363 n.81. Judge Seymour explained:

> [S]ince title and reservation status are not congruent concepts, the 1882 Executive Order in no way interfered with Congress' intent that the Uncompahgres hold no title to the land. It merely provided a reservation within which, until the allotment process was complete, the Uncompahgres had temporary occupancy of the whole.
>
> Following allotment, the lands could be and were opened to public purchase and settlement. Any unallotted land would then be returned to the United States, leaving only individual tribal members with allotments in severalty. *See* [section 3 of the 1880 Act]. But in my view it is clear that this title arrangement did not undermine the jurisdictional boundaries created by the 1882 Executive Order. The end result was an Indian reservation where the Indians held title to their allotted parcels and the remainder of the land was opened to the public.

*Ute III*, 773 F.2d at 1097.

The Tribe argues that the Solicitor and the district court misunderstood these decisions. Br. 41-49. The Tribe begins by stating "[t]he settled legal rule" that "once land is set apart for a tribe, only Congress, not the executive branch, can deprive the tribe of any rights in the land." Br. 41-42. It argues that "[t]he courts have already applied this law to the Uncompahgre Reservation and concluded that there is no such Act of Congress." Br. 42. That may be true with respect to the

jurisdictional status of the Uncompahgre Reservation, but the issue here is compensable title.  "Adjudicating reservation boundaries is conceptually quite distinct from adjudicating title to the same lands.  One inquiry does not necessarily have anything in common with the other, as title and reservation status are not congruent concepts in Indian Law.  ...  In other words, who has title is not the same question as whether Congress has erased or altered a reservation's boundaries." *Murphy v. Royal*, 875 F.3d 896, 952 (10th Cir. 2017) (cleaned up).

In summarizing the *Ute Indian Tribe* decisions, the Tribe fails to acknowledge the distinction made in the M-Opinion between jurisdictional status and ownership.  *See* Br. 43-44.  In *Ute III*, the Tenth Circuit held that Congress never disestablished the Uncompahgre Reservation for jurisdictional purposes even though it restored the unallotted lands to the public domain, not "that Congress never restored [the unallotted] lands to the public domain" as the Tribe asserts.  *See* Br. 44.  The Tribe simply ignores that a majority of the Tenth Circuit, sitting en banc, held that the original Uncompahgre Reservation in Utah remained "Indian country" while also recognizing "Congress' intent that the Uncompahgres hold no title to the land," *Ute III*, 773 F.2d at 1097.

The Tribe criticizes the Solicitor's discussion of Interior's response to the Tribe's 1934 request to restore land within the Uncompahgre Reservation to the Tribe under IRA § 3, presumably referring to App.359.  Br. 44-45.  Contrary to the

Tribe's characterization, the Secretary of the Interior did not reject the request because the Uncompahgre Reservation had been disestablished. Although the Secretary referred to the "former Uncompahgre Reservation"—consistent with the government's position that it had been disestablished—the restoration request was rejected because the unallotted lands had been "restored to the public domain," meaning that the Tribe would receive no compensation. App.359.

The Tribe then notes the government's current exercise of jurisdiction over the Uncompahgre Reservation consistent with *Ute III*. Br. 46. The Tribe errs, however, in asserting that the Solicitor "admitted that the 1880 Agreement *provides for* the creation of a new Reservation for the Uncompahgre Band." *See* Br. 46 (citing App.350) (emphasis added). As the M-Opinion explained there, the 1880 Agreement provided for "allotments in severalty" and the 1882 Executive Order was "[i]n accord with" the agreement as it withdrew land from the public domain to facilitate the selection of parcels for allotments. *See* Part I.A above. And the Tribe further errs in asserting that the Solicitor "does not provide any analysis of the Tenth Circuit's decisions" in making his distinction between Indian country status and eligibility for restoration under IRA § 3. *See* Br. 47. As explained above, he relied on Judge Seymour's opinion in *Ute III*.

In sum, none of the Tribe's arguments addressed above nor its closing argument (Br. 47-49) demonstrate that the 2018 Decision and M-Opinion are contrary to the Tenth Circuit's decision in *Ute III*.

## CONCLUSION

For all of these reasons, Plaintiffs fail to meet their burden under 5 U.S.C. § 706(2)(A) to demonstrate that Interior's 2018 Decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." The district court's judgment should be affirmed.

Respectfully submitted,

/s/ *Mary Gabrielle Sprague*
ADAM R.F. GUSTAFSON
*Principal Deputy Assistant Attorney General*

AMBER BLAHA
MARY GABRIELLE SPRAGUE
*Attorneys*
Environment and Natural Resources Division
U.S. Department of Justice
Post Office Box 7415
Washington, D.C. 20044
(202) 532-3302
mary.gay.sprague@usdoj.gov

December 10, 2025
DJ # 90-2-4-15376

# CERTIFICATE OF COMPLIANCE

1.      This document complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f) this document contains 12,993 words.

2.      This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

/s/ *Mary Gabrielle Sprague*
MARY GABRIELLE SPRAGUE

Counsel for Appellees

**APPELLEES' ADDENDUM OF PERTINENT STATUTES**

## APPELLEES' ADDENDUM TABLE OF CONTENTS

| Document Description | Page No. |
| --- | --- |
| 25 U.S.C. § 5103(a) (Indian Reorganization Act § 3) | Add. 1 |
| Act of March 3, 1887, 24 Stat. 548-549 | Add. 2 |
| Indian Appropriations Act of June 7, 1897, 30 Stat. 62, 87 | Add. 4 |
| Other pertinent statutes are included in the Appendix. | |

**25 U.S.C. § 5103(a) (Indian Reorganization Act § 3)**

(a) **Protection of existing rights**
The Secretary of the Interior, if he shall find it to be in the public interest, is authorized to restore to tribal ownership the remaining surplus lands of any Indian reservation heretofore opened, or authorized to be opened, to sale, or any other form of disposal by Presidential proclamation, or by any of the public-land laws of the United States: *Provided, however,* That valid rights or claims of any persons to any lands so withdrawn existing on the date of the withdrawal shall not be affected by this Act: *Provided further,* That this section shall not apply to lands within any reclamation project heretofore authorized in any Indian reservation.

**Act of March 3, 1887, 24 Stat. 548-549**

**CHAP. 368.**—An act granting the Utah Midland Railway Company the right of way through the Uncompahgre and Uintah Reservations, in the Territory of Utah, and for other purposes.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That the right of way is hereby granted, as hereinafter set forth, to the Utah Midland Railway Company, a corporation created and existing under and by virtue of the laws of the Territory of Utah, and it is hereby authorized and empowered, to locate, construct, own, equip, operate, use, and maintain a railway, telegraph, and telephone line through the Indian reservations situated in the Territory of Utah and known as the Uncompahgre Reservation and the Uintah Reservation, occupied by the Tabequache Utes, Uintah Utes, White River Utes, and other tribes of Indians. Said railway shall enter said Uncompahgre Reservation at a point on the east boundary-line of Utah Territory at or near the place where the White River crosses said boundary-line, running thence by the most feasible route in a general westerly direction across said Uncompahgre Reservation and across said Uintah Reservation to the western boundary of said Uintah Reservation, crossing such western boundary at the most feasible point to reach Salt Lake City.

    **SEC. 2.** That the right of way hereby granted to said company shall be seventy-five feet in width on each side of the central line of said railroad as aforesaid; and said company shall also have the right to take from said lands adjacent to the line of said road material, stone, earth, and timber necessary for the construction of said railroad; also ground adjacent to such right of way for station-buildings, depots, machine-shops, side-tracks, turnouts, and water-stations, not to exceed in amount three hundred feet in width and three thousand feet in length for each station, to the extent of one station for each ten miles of its road: *Provided*, That the President of the United States may, in his discretion, require that the consent of the Indians to said right of way shall be obtained by said railroad company, in such manner as he may prescribe, before any right under this act shall accrue to said company.

    **SEC. 3.** That it shall be the duty of the Secretary of the Interior to fix the amount of compensation to be paid the Indians for such right of way and materials, and provide the time and manner for the payment thereof, and also to ascertain and fix the amount of compensation to be made individual members of the tribe for damages sustained by them by reason of the construction of said road; but no right of any kind shall vest in said railway company in or to any part of the right of way herein provided for until plats thereof, made upon actual survey for the definite

location of such railroad, and including the points for station-buildings, depots, machine-shops, side-tracks, turnouts, and water-stations, shall be filed with and approved by the Secretary of the Interior, whose approval shall be made in writing, and be open for the inspection of any party interested therein, and until the compensation aforesaid has been fixed and paid; and the surveys, construction, and operation of such railroad shall be conducted with due regard for the rights of the Indians, and in accordance with such rules and regulations as the Secretary of the Interior may make to carry out this provision.

**SEC. 4.** That said company shall not assign or transfer or mortgage this right of way for any purpose whatever until said road shall be completed: *Provided,* That the company may mortgage said franchise, together with the rolling-stock, for money to construct and complete said road: *And provided further*, That the right granted herein shall be lost and forfeited by said company unless the road is constructed and in running order across said reservations within three years from the passage of this act, or if the consent of the Indians is required under the terms of the proviso to section two of this act, then within three years from the date when such consent shall be obtained, as provided in section two of this act.

**SEC. 5.** That said railway company shall accept this right of way upon the expressed condition, binding upon itself, its successors and assigns, that they will neither aid, advise, nor assist in any effort looking towards the changing or extinguishing the present tenure of the Indians in their land, and will not attempt to secure from the Indian tribes any further grant of land or its occupancy than is hereinbefore provided: *Provided,* That any violation of the condition mentioned in this section shall operate as a forfeiture of all the rights and privileges of said railway company under this act.

**SEC. 6.** That Congress may at any time amend, add to, alter, or repeal this act.

**SEC. 7.** That this act shall be in force from its passage

Approved, March 3, 1887.

**Indian Appropriations Act of June 7, 1897, 30 Stat. 62, 87**

The Secretary of the Interior is hereby directed to allot agricultural lands in severalty to the Uncompahgre Ute Indians now located upon or belonging to the Uncompahgre Indian Reservation in the State of Utah, said allotments to be upon the Uncompahgre and Uintah reservations or elsewhere in said State. And all the lands of said Uncompahgre Reservation not theretofore allotted in severalty to said Uncompahgre Utes shall, on and after the first day of April, eighteen hundred and ninety-eight, be open for location and entry under all the land laws of the United States; excepting, however, therefrom all lands containing gilsonite, asphalt, elaterite, or other like substances.

And the title to all of the said lands containing gilsonite, asphaltum, elaterite, or other like substances is reserved to the United States.